# SHANNON *v.* UNITED STATES

No. 92–8346.   Argued March 22, 1994—Decided June 24, 1994

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 588.

*Thomas R. Trout,* by appointment of the Court, 510 U. S. 943, argued the cause and filed briefs for petitioner.

*Amy L. Wax* argued the cause for the United States. With her on the brief were *Solicitor General Days, Assist-*

575

*ant Attorney General Harris, Deputy Solicitor General Bryson,* and *Deborah Watson.*\*

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we consider whether a federal district court is required to instruct the jury regarding the consequences to the defendant of a verdict of "not guilty by reason of insanity," either under the Insanity Defense Reform Act of 1984 or as a matter of general federal practice. We conclude that such an instruction is not required, and therefore affirm.

I

A

Prior to the enactment of the Insanity Defense Reform Act of 1984 (IDRA or Act), 18 U. S. C. §§ 17, 4241–4247, federal courts generally did not recognize a verdict of "not guilty by reason of insanity" (NGI). Defendants who mounted a successful insanity defense—that is, those who raised a reasonable doubt as to their sanity at the time of the offense—were simply found "not guilty." See, *e. g., United States* v. *McCracken,* 488 F. 2d 406, 409, 418 (CA5 1974); *Evalt* v. *United States,* 359 F. 2d 534, 537 (CA9 1966). In addition, there was no general federal civil commitment procedure available to ensure that an insanity acquittee would receive proper care and treatment. Only in the District of Columbia was a defendant who successfully presented an insanity defense to a federal criminal charge subject to a federal commitment process—a process governed by a 1955 congressional enactment. See 69 Stat. 609, as amended, D. C. Code Ann. § 24–301 (1981).[1] Elsewhere, federal authorities

---

\**Peter Margulies* filed a brief for the Coalition for the Fundamental Rights of Ex-Patients urging reversal.

[1] See also *United States* v. *Brawner,* 471 F. 2d 969, 996 (CADC 1972) (en banc); *United States* v. *Cohen,* 733 F. 2d 128, 129–131 (CADC 1984) (en banc); *United States* v. *Thigpen,* 4 F. 3d 1573, 1576, and n. 1 (CA11 1993) (en banc), cert. pending, No. 93–6747.

were forced to rely on the willingness of state authorities to institute civil commitment proceedings. Reliance on state cooperation was "at best a partial solution to a serious problem," however, and federal courts "[t]ime and again . . . decried this gaping statutory hole." *McCracken, supra,* at 417.

Before the IDRA was enacted, the Federal Courts of Appeals generally disapproved of instructing the jury concerning the post-trial consequences of an insanity acquittal. Thus, jurors typically were given no information with regard to what would happen to a defendant acquitted by reason of insanity. The courts in general gave two reasons for disapproving such instructions. First, they pointed out that, given the absence of a federal commitment procedure, the consequences of an insanity acquittal were far from certain. Second, they concluded that such instructions would run afoul of the well-established principle that a jury is to base its verdict on the evidence before it, without regard to the possible consequences of the verdict. See, *e. g., McCracken, supra,* at 423; *Evalt, supra,* at 546; *United States* v. *Borum,* 464 F. 2d 896, 900–901 (CA10 1972).

The only Court of Appeals to endorse the practice of instructing the jury regarding the consequences of an insanity acquittal was the District of Columbia Circuit. See *Lyles* v. *United States,* 254 F. 2d 725 (1957) (en banc), cert. denied, 356 U. S. 961 (1958). In *Lyles,* the District of Columbia Circuit addressed the jury instruction question in the context of D. C. Code Ann. § 24–301 (1951 ed., Supp. V), which, unlike generally applicable federal law, provided for a special verdict of NGI and, as noted above, a civil commitment procedure. The *Lyles* court recognized the "well established and sound" doctrine "that the jury has no concern with the consequences" of a verdict, but stated that the doctrine "d[id] not apply" to the situation before it. 254 F. 2d, at 728. According to the court, although jurors generally were "aware of the meanings of verdicts of guilty and not guilty," they

were unfamiliar with the meaning of an NGI verdict. *Ibid.*
The court concluded that jurors had "a right to know" the
meaning of an NGI verdict "as accurately as [they] kno[w] by
common knowledge the meaning of the other two possible
verdicts." *Ibid.*

The acquittal of John Hinckley on all charges stemming
from his attempt on President Reagan's life, coupled with
the ensuing public focus on the insanity defense, prompted
Congress to undertake a comprehensive overhaul of the in-
sanity defense as it operated in the federal courts. The re-
sult of this effort was the IDRA. In the IDRA, Congress
made insanity an affirmative defense to be proved by the
defendant by clear and convincing evidence, and created a
special verdict of "not guilty only by reason of insanity." 18
U. S. C. §§ 17 and 4242(b). In addition, Congress filled the
"statutory hole" that had been identified by federal courts,
see *McCracken, supra,* by creating a comprehensive civil
commitment procedure. § 4243. Under that procedure, a
defendant found NGI is held in custody pending a court
hearing, which must occur within 40 days of the verdict.
§ 4243(c). At the conclusion of the hearing, the court de-
termines whether the defendant should be hospitalized or
released. §§ 4243(d), (e).

B

At about 4 a.m. on August 25, 1990, a police officer stopped
petitioner Terry Lee Shannon, a convicted felon, on a street
in Tupelo, Mississippi. For reasons not explained in the rec-
ord before us, the officer asked Shannon to accompany him
to the station house to speak with a detective. After telling
the officer that he did not want to live anymore, Shannon
walked across the street, pulled a pistol from his coat, and
shot himself in the chest.

Shannon survived his suicide attempt and was indicted for
unlawful possession of a firearm by a felon in violation of 18
U. S. C. § 922(g)(1). At trial, he raised the insanity defense,
and asked the District Court to instruct the jury that he

would be involuntarily committed if the jury returned an NGI verdict.[2] The District Court refused to give Shannon's proposed charge. Instead, it instructed the jury "to apply the law as [instructed] regardless of the consequence," and that "punishment . . . should not enter your consideration or discussion." App. A–27 to A–28. The jury returned a guilty verdict.

The Court of Appeals for the Fifth Circuit affirmed Shannon's conviction. 981 F. 2d 759 (1993). The court noted that under its pre-IDRA precedent, juries were not to be instructed concerning the consequences of an insanity acquittal. *Id.*, at 761–762 (discussing *United States* v. *McCracken,* 488 F. 2d 406 (CA5 1974)). Turning to the text of the IDRA, the court observed that Congress had "said nothing about informing juries of the consequences" of an NGI verdict. 981 F. 2d, at 764. Because there was no "statutory requirement" to the contrary, the court "adhere[d] to the established axiom that it is inappropriate for a jury to consider or be informed about the consequences of its verdict." *Ibid.*[3]

---

[2] Shannon asked the court to give either of the two following instructions: (1) "'In the event it is your verdict that [Shannon] is not guilty only by reason of insanity, it is required that the Court commit [him]'"; or (2) "'[Y]ou should know that it is required that the Court commit [Shannon] to a suitable hospital facility until such time as [he] does not pose a substantial risk of bodily injury to another or serious damage to the property of another.'" App. A–22.

[3] In addition to the court below, the Ninth and Eleventh Circuits recently have reaffirmed their pre-IDRA holdings that juries generally should not be instructed concerning the consequences of an insanity acquittal. See *United States* v. *Frank,* 956 F. 2d 872, 880–882 (CA9 1991), cert. denied, 506 U. S. 932 (1992); *Thigpen,* 4 F. 3d, at 1578. The Third Circuit has held that the decision to give such an instruction should be left to "the sound discretion of the trial judge." *United States* v. *Fisher,* 10 F. 3d 115, 122 (1993), cert. pending, No. 93–7000. A panel of the Second Circuit recently divided three ways on the issue. See *United States* v. *Blume,* 967 F. 2d 45, 50 (1992) (Newman, J., concurring) ("I believe the instruction should always be given unless the defendant prefers its omission. Judge Winter believes the instruction should normally not be

We granted certiorari, 510 U. S. 943 (1993), in order to consider whether federal district courts are required to instruct juries with regard to the consequences of an NGI verdict.

## II

It is well established that when a jury has no sentencing function,[4] it should be admonished to "reach its verdict without regard to what sentence might be imposed." *Rogers* v. *United States*, 422 U. S. 35, 40 (1975).[5] The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion. See *Pope* v. *United States*, 298 F. 2d 507, 508 (CA5 1962); cf. *Rogers, supra,* at 40.

Despite these familiar precepts, Shannon contends that an instruction informing the jury of the consequences of an NGI

given. Judge Lumbard believes that the decision whether to give the instruction should be left to the discretion of the trial judge").

[4] Particularly in capital trials, juries may be given sentencing responsibilities. See, *e. g., Simmons* v. *South Carolina, ante,* p. 154. It is undisputed that the jury had no such responsibilities in Shannon's case.

[5] In *Rogers*, the jury had been deliberating for almost two hours without reaching a verdict. After the trial court informed the jury that it would accept a verdict of "Guilty as charged with extreme mercy of the Court," the jury returned such a verdict within minutes. 422 U. S., at 36–37 (internal quotation marks omitted). We concluded that, instead of giving the jurors information about sentencing (that is, that they could recommend "extreme mercy"), the trial court should have "admoni[shed] [them] that [they] had no sentencing function and should reach [their] verdict without regard to what sentence might be imposed." *Id.,* at 40.

verdict is required under the IDRA whenever requested by the defendant. He also argues that such an instruction is required as a matter of general federal criminal practice. We address each argument in turn.

## A

To determine whether Congress intended courts to depart from the principle that jurors are not to be informed of the consequences of their verdicts, we turn first, as always, to the text of the statute. The IDRA refers to the subject of jury instructions only once, and that reference occurs in its description of the possible verdicts a jury may return. Under the Act, "the jury shall be instructed to find . . . the defendant—(1) guilty; (2) not guilty; or (3) not guilty only by reason of insanity." 18 U. S. C. §4242(b). The text of the Act gives no indication that jurors are to be instructed regarding the consequences of an NGI verdict. As the court below observed, the Act "leaves the jury solely with its customary determination of guilt or innocence." 981 F. 2d, at 763. The Act's text thus gives no support to Shannon's contention that an instruction informing the jury of the consequences of an NGI verdict is required.

Shannon asserts, however, that an express statutory directive is not necessary because, by modeling the IDRA on D. C. Code Ann. §24–301 (1981),[6] Congress impliedly adopted the District of Columbia Circuit's decision in *Lyles* and the practice endorsed by that decision of instructing the jury as to the consequences of an NGI verdict. For this argument he relies on *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 36 (1899), in which we stated:

---

[6] District of Columbia Code Ann. §24–301 continued to govern the operation of the insanity defense in federal criminal prosecutions in the District of Columbia until the passage of the IDRA. Cf. *United States* v. *Crutchfield*, 893 F. 2d 376, 377–379 (CADC 1990) (holding that the IDRA applies prospectively to insanity acquittees committed after its enactment).

> "By a familiar canon of interpretation, heretofore applied by this court whenever Congress . . . has borrowed from the statutes of a State provisions which had received in that State a known and settled construction before their enactment by Congress, that construction must be deemed to have been adopted by Congress together with the text which it expounded, and the provisions must be construed as they were understood at the time in the State."

See also *Carolene Products Co.* v. *United States*, 323 U. S. 18, 26 (1944) ("[T]he general rule [is] that adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretations of the wording"); *Cathcart* v. *Robinson*, 5 Pet. 264, 280 (1831). The canon of interpretation upon which Shannon relies, however, is merely a "presumption of legislative intention" to be invoked only "under suitable conditions." *Carolene Products*, *supra*, at 26. We believe that the "conditions" are not "suitable" in this case. Indeed, although Congress may have had the District of Columbia Code in mind when it passed the IDRA, see *United States* v. *Crutchfield*, 893 F. 2d 376, 378 (CADC 1990), it did not, in the language of *Hof*, "borrow" the terms of the IDRA from the District of Columbia Code. Rather, Congress departed from the scheme embodied in D. C. Code Ann. § 24–301 in several significant ways.

The IDRA, for example, requires a defendant at trial to prove insanity by clear and convincing evidence, 18 U. S. C. § 17(b); the District of Columbia statute, by contrast, employs a preponderance standard, D. C. Code Ann. § 24–301(j). A commitment hearing must be held under the IDRA within 40 days of an NGI verdict, 18 U. S. C. § 4243(c); the period is 50 days under the District of Columbia scheme, D. C. Code Ann. § 24–301(d)(2)(A). Under the IDRA, a defendant whose offense involved bodily injury to another or serious damage to another's property, or the substantial risk thereof, must demonstrate at the hearing by clear and convincing evi-

dence that he is entitled to release, 18 U. S. C. § 4243(d); under the District of Columbia scheme, an acquittee, regardless of the character of his offense, need only meet the preponderance standard, D. C. Code Ann. § 24–301(k)(3). The IDRA provides that an acquittee, once committed, may be released when he no longer presents a substantial risk of harm to others or to their property, 18 U. S. C. § 4243(f); an acquittee under the District of Columbia system may be released from commitment when he "will not in the reasonable future be dangerous to himself or others," D. C. Code Ann. § 24–301(e). Finally, in the IDRA, Congress rejected the broad test for insanity that had been utilized under the District of Columbia provision,[7] and instead adopted a more restrictive formulation under which a person is deemed insane if he is unable "to appreciate the nature and quality or the wrongfulness of his acts." 18 U. S. C. § 17(a). We believe that these significant differences between the IDRA and D. C. Code Ann. § 24–301 render the canon upon which Shannon relies inapplicable in this case.[8]

---

[7] Under the District of Columbia system, the courts had defined insanity as either the lack of substantial capacity to conform one's conduct to the requirements of the law *or* the lack of substantial capacity to appreciate the wrongfulness of one's acts. See *Brawner*, 471 F. 2d, at 973–995.

[8] In addition, we note that the canon upon which Shannon relies is a canon of *statutory construction*. It stems from the notion that a court, in interpreting "borrowed" statutory language, should apply the same construction to that language that was placed upon it by the courts in the jurisdiction from which it was borrowed. In this case, however, the court in the jurisdiction from which the statutory text was supposedly borrowed—that is, the *Lyles* court—did not purport to construe the language of the District of Columbia Code provision; rather, in holding that jurors should be informed of the consequences of an NGI verdict, the court appears to have relied on its supervisory power over the Federal District Courts in the District of Columbia. Cf. *infra*, at 584. Thus, we conclude that the canon is also inapplicable in this case because there was no "known and settled construction," *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 36 (1899), of the statute that Congress could have adopted by virtue of borrowing language from the District of Columbia statutory scheme.

Alternatively, Shannon contends that a provision explicitly requiring the instruction is unnecessary for a different reason: namely, that Congress made its intention to adopt the *Lyles* practice crystal clear in the IDRA's legislative history. In particular, Shannon points to the following statement in the Senate Report:

> "The Committee endorses the procedure used in the District of Columbia whereby the jury, in a case in which the insanity defense has been raised, may be instructed on the effect of a verdict of not guilty by reason of insanity. If the defendant requests that the instruction not be given, it is within the discretion of the court whether to give it or not." S. Rep. No. 98–225, p. 240 (1983) (footnotes omitted).

Members of this Court have expressed differing views regarding the role that legislative history should play in statutory interpretation. Compare *County of Washington* v. *Gunther*, 452 U. S. 161, 182 (1981) (REHNQUIST, J., dissenting) ("[I]t [is] well settled that the legislative history of a statute is a useful guide to the intent of Congress"), with *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597, 617 (1991) (SCALIA, J., concurring in judgment) (legislative history is "unreliable . . . as a genuine indicator of congressional intent"). We are not aware of any case, however (and Shannon does not bring one to our attention), in which we have given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute. On its face, the passage Shannon identifies does not purport to explain or interpret any provision of the IDRA. Rather, it merely conveys the Committee's "endorsement" of the *Lyles* "procedure"—a procedure that Congress did not include in the text of the Act. To give effect to this snippet of legislative history, we would have to abandon altogether the text of the statute as a guide in the interpretative process. We agree with the District of Columbia Circuit that

"courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point." *International Brotherhood of Elec. Workers, Local Union No. 474, AFL–CIO* v. *NLRB,* 814 F. 2d 697, 712 (1987) (emphasis deleted). We thus conclude that there is no support in the Act for the instruction Shannon seeks.[9]

## B

Setting the Act aside, Shannon argues that the instruction he proposes is required as a matter of general federal criminal practice. Presumably, Shannon asks us to invoke our supervisory power over the federal courts. According to Shannon, the instruction is necessary because jurors are generally unfamiliar with the consequences of an NGI verdict, and may erroneously believe that a defendant who is found NGI will be immediately released into society. Jurors who are under this mistaken impression, Shannon continues, may also fear that the defendant, if released, would pose a danger to the community. Shannon concludes that such jurors, in order to ensure that the defendant will not be released, may be tempted to return a guilty verdict in a case in which an NGI verdict would be appropriate.

Even assuming Shannon is correct that some jurors will harbor the mistaken belief that defendants found NGI will be released into society immediately—an assumption that is

---

[9] In the court below, Shannon made the additional argument that because Congress filled the "gap" that had been identified by the Federal Courts of Appeals prior to the IDRA with a general federal civil commitment procedure, "the practice announced in *Lyles* must now be applied nationwide." 981 F. 2d 759, 763 (CA5 1993). We find this argument (which Shannon makes only implicitly before this Court) unpersuasive. As noted above, although the lack of a federal commitment procedure before the passage of the IDRA was one reason for rejecting a *Lyles*-type instruction, courts generally, and properly, relied additionally on the principle that juries are not to be concerned with the consequences of their verdicts. This principle is not altered by the fact that Congress established a civil commitment procedure. See *Thigpen,* 4 F. 3d, at 1577.

open to debate[10]—the jury in his case was instructed "to apply the law as [instructed] regardless of the consequence," and that "punishment . . . should not enter your consideration or discussion." App. A–27 to A–28. That an NGI verdict was an option here gives us no reason to depart from "the almost invariable assumption of the law that jurors follow their instructions." *Richardson* v. *Marsh,* 481 U. S. 200, 206 (1987). Indeed, although it may take effort on a juror's part to ignore the potential consequences of the verdict, the effort required in a case in which an NGI defense is raised is no different from that required in many other situations. For example, if the Government fails to meet its burden of proof at trial, our judicial system necessarily assumes that a juror will vote to acquit, rather than to convict, even if he is convinced the defendant is highly dangerous and should be incarcerated. We do not believe that the situation involving an NGI verdict should be treated any differently.

We also are not persuaded that the instruction Shannon proposes would allay the fears of the misinformed juror about whom Shannon is concerned. "[I]f the members of a jury are so fearful of a particular defendant's release that they would violate their oaths by convicting [the defendant] solely in order to ensure that he is not set free, it is questionable whether they would be reassured by anything short of an instruction strongly suggesting that the defendant, if found NGI, would very likely be civilly committed for a

---

[10] We are not convinced that jurors are as unfamiliar with the consequences of an NGI verdict as Shannon suggests. It may have been the case in 1957 that, in contrast to verdicts of guilty and not guilty, "a verdict of not guilty by reason of insanity ha[d] no . . . commonly understood meaning." *Lyles* v. *United States,* 254 F. 2d 725, 728 (CADC 1957) (en banc), cert. denied, 356 U. S. 961 (1958). Today, however, there is no reason to assume that jurors believe that defendants found NGI are immediately set free. See *Fisher,* 10 F. 3d, at 122 ("[H]ighly publicized cases, such as that involving John Hinckley, have dramatized the possibility of civil commitment following an NGI verdict"). See also *Blume,* 967 F. 2d, at 54 (Winter, J., concurring in result).

lengthy period." *United States* v. *Fisher*, 10 F. 3d 115, 122 (CA3 1993), cert. pending, No. 93–7000. An accurate instruction about the consequences of an NGI verdict, however, would give no such assurance. Under the IDRA, a postverdict hearing must be held within 40 days to determine whether the defendant should be released immediately into society or hospitalized. See 18 U. S. C. §§ 4243(c), (d). Thus, the only mandatory period of confinement for an insanity acquittee is the period between the verdict and the hearing. Instead of encouraging a juror to return an NGI verdict, as Shannon predicts, such information might have the opposite effect—that is, a juror might vote to convict in order to eliminate the possibility that a dangerous defendant could be released after 40 days or less.[11] Whether the instruction works to the advantage or disadvantage of a defendant is, of course, somewhat beside the point. Our central concern here is that the inevitable result of such an instruction would be to draw the jury's attention toward the very thing—the possible consequences of its verdict—it should ignore.

Moreover, Shannon offers us no principled way to limit the availability of instructions detailing the consequences of a verdict to cases in which an NGI defense is raised. Jurors may be as unfamiliar with other aspects of the criminal sentencing process as they are with NGI verdicts. But, as a general matter, jurors are not informed of mandatory minimum or maximum sentences, nor are they instructed regard-

---

[11] As the court below observed, "a jury could assume that due to overcrowded mental hospitals, strapped social services budgets, sympathetic judges, etc., a defendant will be released after only a short period of commitment. To combat the prospect of early release, the jury could simply opt to find him guilty." 981 F. 2d, at 763, n. 6. Indeed, depending upon the content of the instruction, information regarding the consequences of an NGI verdict could influence a juror's decision in countless—and unpredictable—ways. See, *e. g., Fisher, supra,* at 121–122, and n. 7 (describing various scenarios in which sentencing information could induce compromise verdicts in the NGI context).

ing probation, parole, or the sentencing range accompanying a lesser included offense. See *United States* v. *Thigpen*, 4 F. 3d 1573, 1578 (CA11 1993) (en banc), cert. pending, No. 93–6747; *United States* v. *Frank*, 956 F. 2d 872, 879 (CA9 1991), cert. denied, 506 U. S. 932 (1992). Because it is conceivable that some jurors might harbor misunderstandings with regard to these sentencing options, a district court, under Shannon's reasoning, might be obligated to give juries information regarding these possibilities as well. In short, if we pursue the logic of Shannon's position, the rule against informing jurors of the consequences of their verdicts would soon be swallowed by the exceptions.

Finally, Congress' recent action in this area counsels hesitation in invoking our supervisory powers. As noted above, the IDRA was the product of a thorough and exhaustive review of the insanity defense as used in the federal courts. Given the comprehensive nature of the task before it, Congress certainly could have included a provision requiring the instruction Shannon seeks. For whatever reason, Congress chose not to do so. Under these circumstances, we are reluctant to depart from well-established principles of criminal practice without more explicit guidance from Congress.

## III

Although we conclude that the IDRA does not require an instruction concerning the consequences of an NGI verdict, and that such an instruction is not to be given as a matter of general practice, we recognize that an instruction of some form may be necessary under certain limited circumstances. If, for example, a witness or prosecutor states in the presence of the jury that a particular defendant would "go free" if found NGI, it may be necessary for the district court to intervene with an instruction to counter such a misstatement. The appropriate response, of course, will vary as is necessary to remedy the specific misstatement or error. We note this possibility merely so that our decision will not be

misunderstood as an absolute prohibition on instructing the jury with regard to the consequences of an NGI verdict. Our observations in this regard are not applicable to Shannon's situation, however, for there is no indication that any improper statement was made in the presence of the jury during his trial.

\* \* \*

Because the District Court properly refused to give the instruction Shannon requested, we affirm.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

A rule that has minimized the risk of injustice for almost 40 years should not be abandoned without good reason. In 1957, shortly after Congress enacted the statute providing for civil commitment of persons found not guilty by reason of insanity in trials conducted in the District of Columbia, the Court of Appeals, sitting in banc, considered whether juries should be instructed about the significance of that provision. Recognizing that an uninformed jury might erroneously find an insane defendant guilty to avoid the risk that a dangerous individual would otherwise go free, the court held that such an instruction should be given. *Lyles* v. *United States,* 254 F. 2d 725 (CADC 1957), cert. denied, 356 U. S. 961 (1958). In an opinion jointly authored by Judge Prettyman and then-Judge Warren Burger, the court explained that the doctrine that the jury has no concern with the consequences of a verdict "does not apply in the problem before us":

> "The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. . . . But a verdict of not guilty by reason of insanity has no such commonly understood meaning. . . . It means neither freedom nor

punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." *Lyles*, 254 F. 2d, at 728.

Concurring with this part of the foregoing opinion, Judge Bazelon acknowledged that "[t]he false assumption that acquittal by reason of insanity, like outright acquittal, frees the accused to walk out on the streets may lead juries to convict, despite strong evidence of insanity at the time of the crime." *Id.*, at 734. Trial courts in the District of Columbia have used a pattern instruction—approved by prosecutors, defense counsel, and trial judges—ever since.[1]

Other federal courts did not give a comparable instruction prior to 1984 because no federal statute authorized civil commitment for insanity acquittees except in the District of Columbia. In those courts, an instruction advising the jury about the consequences of a verdict of not guilty by reason of insanity—often that such a defendant would, indeed, go free—would have tended to increase the risk of improper convictions. It was therefore appropriate for federal judges to adhere to the general rule that the jury should be instructed to base its decision on the evidence before it, with-

---

[1] Instruction 5.11 in the 1978 edition of the District of Columbia Criminal Jury Instructions reads:

"If the defendant is found not guilty by reason of insanity it becomes the duty of the court to commit him to St. Elizabeths Hospital. There will be a hearing within 50 days to determine whether the defendant is entitled to release. In that hearing the defendant has the burden of proof. The defendant will remain in custody, and will be entitled to release from custody only if the court finds by a preponderance of the evidence that he is not likely to injure himself or other persons due to mental illness."

out regard to the possible consequences of its verdict. That rule, of course, was primarily designed to protect defendants from the risk that jurors might otherwise improperly rely on matters such as sympathy for the victim, arguments of counsel, or inadmissible comments in the courtroom.

When Congress enacted the Insanity Defense Reform Act of 1984 (Act), 18 U. S. C. §§ 17, 4241–4247, it established a civil commitment process for the entire federal system, thus making the basis for the District of Columbia Circuit's holding in *Lyles* applicable to all federal courts. The Act's legislative history unmistakably demonstrates that the Act's sponsors assumed that the *Lyles* precedent would thereafter be followed nationwide. See *ante*, at 583. That assumption does not have the force of a statutory mandate, but it verifies that thoughtful legislators familiar with the issue believed that precedent to be entirely sound. That this Court should now decide to change an established rule that Congress accepted and that protects defendants meaningfully against an obvious risk of injustice is startling—particularly when that change is for no reason other than a perceived inconsistency with another rule that is generally protective of defendants' rights. A far wiser disposition would allow the defendant to choose between the two rules, rather than tilt the scales to favor the prosecutor in every case.

The incongruity of the Court's holding is compounded by its selection of *Rogers* v. *United States*, 422 U. S. 35 (1975), as its authority for what it calls the "principle" that juries should not consider the consequences of their verdict. *Ante*, at 579. It is worth noting that the writer of the Court's opinion in *Rogers*—Chief Justice Burger—was also one of the authors of *Lyles*. In *Rogers*, the jury had sent the judge a note asking whether he would accept a verdict of "Guilty as charged with extreme mercy of the Court"; when the court answered yes, the jury returned five minutes later with that verdict. *Rogers*, 422 U. S., at 36–37. What *Rogers* held is

that the guilty verdict had to be set aside because the court had violated Rule 43 of the Federal Rules of Criminal Procedure by responding to an inquiry from the jury without advising defense counsel. *Id.*, at 40–41. The Court also considered the judge's response to be misleading because it did not advise the jury that their recommendation of mercy would not be binding on the court. *Ibid.* In that context, the failure to admonish the jury that it should reach its verdict without regard to what sentence might be imposed was prejudicial to the defendant. Instead of supporting the majority's view, the case is more relevant for its illustration of how concerned juries are about the actual consequences of their verdicts. When there is a realistic danger that jurors' deliberations may be distorted by an incorrect assumption about those consequences, elementary notions of fairness demand that a clarifying instruction be given.

The Court suggests that the instruction might actually prejudice the defendant. *Ante*, at 585–586. That argument lacks merit, as there is no need to give the instruction unless the defendant requests it. Alternatively, the Court advances the tired argument that if we followed the practice approved in *Lyles*, "the rule against informing jurors of the consequences of their verdicts would soon be swallowed by the exceptions," *ante*, at 587. Given that the *Lyles* rule has survived in the District since 1957 without such consequences, this concern is illusory. Some courts have assumed that the instruction would help jurors focus on issues of guilt instead of punishment. "Freed from confusion and fear as to the practical effect of a verdict of not guilty by reason of insanity, jurors should be able to decide the insanity issue solely on the evidence and law governing the defense." *State* v. *Shickles*, 760 P. 2d 291, 298 (Utah 1988). Rather than relying on a totally unsubstantiated qualm belied by history, it would be far wiser for the Court simply to recognize both the seriousness of the harm that may result from

the refusal to give the instruction and the absence of any identifiable countervailing harm that may result from giving it.

The Court also contends that jurors today are more familiar with the consequences of a verdict of not guilty by reason of insanity than they were in 1957 when *Lyles* was decided. *Ante,* at 584, n. 9. No one has suggested, however, that the level of understanding even approximates that of the conventional choice between "guilty" and "not guilty." Indeed, one recent study concluded that "the public overestimates the extent to which insanity acquittees are released upon acquittal and underestimates the extent to which they are hospitalized as well as the length of confinement of insanity acquittees who are sent to mental hospitals."[2] As long as significant numbers of potential jurors believe that an insanity acquittee will be released at once, the instruction serves a critical purpose. Yet even if, as the Court seems prepared to assume, all jurors are already knowledgeable about the issue, surely telling them what they already know can do no harm.

An increasing number of States that have considered the question endorses use of the instruction,[3] as has the American Bar Association.[4] Judge Newman's succinct assessment

---

[2] Silver, Cirincione, and Steadman, Demythologizing Inaccurate Perceptions of the Insanity Defense, 18 Law and Human Behavior 63, 68 (Feb. 1994).

[3] See, *e. g., Erdman* v. *State,* 315 Md. 46, 553 A. 2d 244 (1989); *State* v. *Shickles,* 760 P. 2d 291 (Utah 1988); *People* v. *Young,* 189 Cal. App. 3d 891, 234 Cal. Rptr. 819 (1987); *People* v. *Thomson,* 197 Colo. 232, 591 P. 2d 1031 (1979); *Commonwealth* v. *Mulgrew,* 475 Pa. 271, 380 A. 2d 349 (1977); *Roberts* v. *State,* 335 So. 2d 285 (Fla. 1976); *Commonwealth* v. *Mutina,* 366 Mass. 810, 323 N. E. 2d 294 (1975); *State* v. *Babin,* 319 So. 2d 367 (La. 1975). See also Fleming, Instructions in State Criminal Case in Which Defendant Pleads Insanity as to Hospital Confinement in Event of Acquittal, 81 A. L. R. 4th 659, 667 (1990) (noting "an apparent trend toward requiring or authorizing a jury instruction on the legal consequences of an insanity acquittal").

[4] ABA Criminal Justice Mental Health Standards § 7–6.8 (1989).

of the pros and cons is exactly right: "There is no reason to keep this information from the jurors and every reason to make them aware of it." *United States* v. *Blume*, 967 F. 2d 45, 52 (CA2 1992) (concurring opinion).

I respectfully dissent.