**GENERAL CLUTCH CORP., Plaintiff,**

v.

**David A. LOWRY & CEMA Technologies, Inc., Defendants.**

**GENERAL CLUTCH CORP., Plaintiff,**

v.

**Yevgeny NOVIKOV (Eugene Novin), Defendant.**

**Nos. 3:93CV1893 (JBA), 3:94CV2200 (JBA).**

United States District Court, D. Connecticut.

March 30, 1998.

Arthur G. Larkin, Gilbert, Segall & Young, Stamford, CT, John H. Chapman, Tenzer Greenblatt, Stamford, CT, for General Clutch Corp.

John H. Chapman, Tenzer Greenblatt, Stamford, CT, for General Clutch Corp.

Wesley W. Whitmyer, Jr., Gene S. Winter, St. Onge, Steward, Johnston & Reens, Stamford, CT, Glenn S. Gitomer, Janeen Olsen Dougherty, McCausland, Keen & Buckman, Radnor, PA, for David P. Lowry, CEMA Technologies, Inc.

*RULING ON DEFENDANTS' MOTION*
*FOR JUDGMENT AS A MATTER*
*OF LAW [docs. 150–1, 150–2]*

ARTERTON, District Judge.

## I. INTRODUCTION

Defendants, David A. Lowry ("Mr. Lowry") and CEMA Technologies, Inc. ("CEMA") move for Judgment as a Matter of Law under Fed.R.Civ.P. 50(b) following a bifurcated trial and jury verdict against both Lowry and CEMA for violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen.Stat., § 35–51 et seq. ("CUTSA") and the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a et seq. ("CUTPA"). Defendant Lowry was also found liable for violations of his employment agreement with plaintiff General Clutch Corporation ("plaintiff" or "GCC"), of the covenant of good faith and fair dealing implied in his employment agreement, and of his fiduciary duties as an officer of GCC. The Court denied plaintiff's motion for punitive damages and attorney's fees with respect to the CUTSA and CUTPA violations, and ordered entry of a judgment in this case against Mr. Lowry in the amount of $137,000.00, against CEMA in the amount of $250,000.00, and against Mr. Lowry and CEMA jointly in the amount of $10.00. *See* Doc. # 148.

Defendants claim that they are entitled to judgment as a matter of law on the following grounds: (1) GCC failed to prove the existence of any technical or business trade secrets which were misappropriated by defendants, (2) GCC failed to prove that Mr. Lowry and CEMA were unjustly enriched, (3) GCC failed to prove that Mr. Lowry violated CUTPA, (4) GCC failed to prove that Mr. Lowry breached any fiduciary duty to it, (5) the damages award against Mr. Lowry was based on prejudicial comments by GCC's counsel regarding excluded testimony of a $20,000 bonus received by him, and thus should be reduced by that amount, and (6) the damages award against Mr. Lowry for breach of fiduciary duty, breach of the employment agreement and breach of

the implied covenant of good faith and fair dealing was duplicative.

## II. STANDARD UNDER RULE 50(b)

In ruling on a motion under Rule 50(b), a court may, if a verdict was returned, (1) allow the judgment to stand, (2) order a new trial, or (3) direct entry of judgment as a matter of law. A district court may grant a motion for judgment as a matter of law only if

> there exists "such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming "that reasonable and fair minded [persons] could not arrive at a verdict against [it]."

*Luciano v. The Olsten Corp.,* 110 F.3d 210, 214 (2d Cir.1997) (*quoting Cruz v. Local Union No. 3,* 34 F.3d 1148, 1154 (2d Cir.1994)). "Judgement n.o.v. is proper 'only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor.' " *Doctor's Assoc., Inc. v. Weible,* 92 F.3d 108, 112 (2d Cir.1996) (*quoting Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986)).

## III. DISCUSSION

### A. EVIDENCE OF TRADE SECRETS

■ Defendants claim that GCC failed to prove the existence of any technical or business trade secrets such that the jury's verdict against them under CUTSA should be set aside and judgment entered for defendants as a matter of law. Specifically, defendants claim that GCC failed to prove the existence of any particularized trade secrets which defendants misappropriated. Defendants contend that GCC, instead, offered only evidence of general friction hinge technology readily obtainable in the industry through ordinary business channels and reference sources, which is insufficient to prove a trade secret claim. *See e.g., Nationwide Mutual Insurance Co. v. Stenger,* 695 F.Supp. 688, 691 (D.Conn.1988). Thus, defendants argue that GCC failed to adduce competent evidence on this claim such that a reasonable jury could have reached the liability verdict returned on this count.

Defendants maintain that the following trial evidence demonstrates that several friction hinge characteristics GCC believed to be trade secrets were admitted by its witnesses, Dr. Martin Waine and Edward Rude, to be either obvious or known in the industry: (1) the tightness of the band around the shaft (Tr. at 839); (2) the hinge development with symmetric or asymmetric torque (Tr. at 849–50); (3) that the hinge housing dimensions are partially dictated by customers and not GCC (Tr. at 856); (4) that test results are given by other manufacturers to their customers (Tr. at 874); (5) that multiple band usage was advertised to customers (Tr. at 875–77, 909); (6) that the general shaping of housing, torque and materials of the shaft, arm and bands are not trade secrets (Tr. 890–93); (7) that placement of slots in the housing to receive the band tail was known in the industry (Tr. at 909); and, (8) that the process of crimping was known in the industry (Tr. at 910–11, 1168–70).

Moreover, defendants assert that these GCC witnesses testified they knew CEMA was *not* using certain of GCC's methods and procedures, such as treatment with Nitrotech, use of "countersink," Dell–1 and Dell–2 treatment processes, washers and grooves. Further, defendants note that these GCC witnesses admitted they did not know whether CEMA actually used allegedly confidential GCC trade secrets, namely, use of an exercise or to break-in hinges, use of certain hinge testing procedures, employing certain development and using design parameters, use of trapped stresses, use of a mandrel to resize and shape bands, and shaft grinding. *See* Tr. at 743–45, 767–74, 780–81.

Defendants claim that this evidence demonstrates that GCC did not prove any trade secret apart from that which was obvious in the industry, and that GCC had no knowledge as to whether CEMA was actually using certain GCC methods and processes. Thus, defendants conclude that this is such substantial evidence in its favor that reasonable jurors could not have rendered a verdict against defendants.

Defendants do appear to concede that GCC introduced some evidence of its claimed trade secrets, but contend that such evidence was insufficient. Defendants submit that the "only possible trade secrets that General Clutch had to hang its hat on were the existence of the question-mark shaped band, the use of grooves and crimping." (Defs.' Mem. at 17). However, defendants maintain that GCC's grooves were symmetrically placed around the axis of rotation, while CEMA's grooves were placed asymmetrically about the axis, and that CEMA's use of band grooves as a frictional element differed from GCC's use of the grooves as a means of distributing lubricant. (Tr. at 961, 1499–1500). Defendants further contend that the reason for crimping is obvious to those in the industry, and in any event GCC witnesses testified that the company did not know if the placement of the crimp holes on its own hinges in relation to the band was the same as on CEMA's hinges. (Tr. at 867–68). With respect to the use of the "question-mark shaped band," defendants submit that the testimony of Michael Cossentine and Mr. Lowry demonstrates that as of 1992, there was at least one other manufacturer, Kato Spring, using the question-mark shaped band, (Tr. at 535–36, 1366–67) and that Mr. Rude, testified that he did not believe the question-mark band was a trade secret because it was already on the market prior to Mr. Lowry's departure from GCC. (Tr. at 1127–30, 1145, 1148).[1] In sum, defendants claim that this evidence does not support the verdict of trade secret misappropriation, and reasonably permits a conclusion only in their favor.

Plaintiff's trial evidence of trade secrets and defendant's misappropriation in designing CEMA friction hinges included evidence regarding the near identical features of the CEMA and GCC hinges. After examining CEMA's engineering drawings and friction hinges, Dr. Waine testified that the housing of CEMA hinges had the same crimping provisions as GCC hinges, as well as the same slot arrangement, shaft and band geometry and method for retaining the band. (Tr. at 758–66). Further, Mr. Rude testified that the diameter of the shaft on CEMA hinges, 3/16 of an inch, was identical to the dimension of the shaft of GCC's Dell II hinge. (Tr. at 1177).

As to the crimping provisions in particular, Dr. Waine testified that the placement and technique of the crimp in relation to the question mark band and the shaft were confidential to GCC and identical in CEMA hinges. (Tr. 671–74). Mr. Rude further testified that GCC's crimping technique was kept confidential, and that of all the general crimping features available, defendants chose features that "exactly mirrored" the relative location of the features in the GCC hinge such that there was "very little difference between the two." (Tr. at 1042–43, 1047). Significantly, Mr. Novin testified that the distance of the center of the pocket from the axis of rotation in a confidential GCC hinge drawing was .185 inches, and then measured the same area in a 1994 CEMA drawing which was also .185 inches, (Tr. at 1656–62), in contrast to Mr. Lowry's testimony that no dimensions of the two hinges were the same. (Tr. at 1530–31). The jury also had for consideration the testimony of David Piacitelli of Miniature Casting, a GCC subcontractor, who considered GCC's confidential technical engineering drawings of its hinges to be so unique that in May of 1993, after receiving and reviewing a drawing from CEMA, he noticed that the part was "nearly identical" to a part that Miniature Casting was making for GCC. (Tr. at 1083–84).

Second, GCC introduced the following evidence which supports a finding of misappropriation by defendants: (1) Mr. Lowry's testimony that he had access to GCC's confidential engineering drawings of its hinge

---

1. Defendants also submit that GCC failed to prove that the Sumitomo and Deico market studies were trade secrets, the only non-technical or business trade secrets it claims GCC even attempted to identify. Defendants assert that the evidence shows that the Sumitomo study was undertaken by the Japanese government, and was not created by GCC, (Tr. at 1424–26), and that with respect to both studies GCC failed to prove that defendants misappropriated this information where Mr. Lowry's testimony demonstrated that neither Mr. Lowry nor CEMA ever utilized any of the information contained in the studies, or secured any sales in the Asia. (Tr. at 1424–26, Damages Verdict Form [Ex. A to Defs.' Mem]).

designs while employed there, which he was obliged to keep secret (Tr. at 1577–79), (2) Mr. Lowry's testimony that he had read the confidential Sumitomo and Deico studies and confidential Deico customer list prior to preparing CEMA's business plan (Tr. 1583–85, 1593–94, 1597), (3) Dr. Waine's testimony that, after putting his house on the market and planning the formation of CEMA, Mr. Lowry visited GCC's major client, Dell Computers for whom GCC was designing a friction hinge, taking with him the soon-to-defect Mr. Novin, who had never previously visited customers (Tr. at 688–91), (4) the testimony of Mr. Jenkins, a Dell employee, that it was not necessary for Mr. Lowry to bring Mr. Novin with him, and that any of GCC engineers could have accompanied him (Tr. at 1313–1315), (5) Dr. Waine's testimony that during that period of time, Mr. Lowry met with Texas Instruments, a potential GCC customer (Tr. 688–89), (6) Dr. Waine's testimony that he would have prevented Lowry from going to Dell and would have terminated his employment had he known of Mr. Lowry's planned start of a competing business (Tr. at 688–89), (7) Mr. Jenkins' testimony that immediately upon leaving GCC Lowry contacted Mr. Jenkins on CEMA's behalf to discuss CEMA's product with him (Tr. at 1308–09), (8) Mr. Lowry's testimony that he utilized his and Novin's relationship with GCC in CEMA's business plan (Tr. at 1564–65), and (9) the testimony of CEMA board member Mark Benson that CEMA initially had no product of its own and that it took two years to develop a product (Damages Tr. at 422).

Finally, the evidence adduced by plaintiff at trial that GCC had a trade secret in the design of its friction hinge described something less than the entirety of friction hinge technology. For example Dr. Waine testified that

> ... [B]ut there was a great deal of particular skill, technology, problem solving techniques, the knowledge of the ranges within which you could permit things to vary within a hinge to make it work, how to solve all of the myriad of [sic] problems. They [defendants] haven't had to face that because they already knew how to do those. They designed hinges for

General Clutch and when they left they designed hinges for CEMA. So, the design parameters that they used were things which they learned how to do at General Clutch, and that's the proprietary information.

(Tr. at 871–72). With regard to GCC's steel band series hinge, Dr. Waine testified that although the use of multiple steel bands itself may not be confidential information because they can be seen through a break in the housing, he testified that

> Well, how to use them, what their effect is, how they're inserted in there, all of the problems associated with making them was. If its a question of the fact by itself in isolation, that's true, it would not have been a trade secret, but everything to do with using them and what their effect is and so on, it was.

(Tr. at 876).

After considering the above evidence introduced at trial, it was not unreasonable for the jury to have reached the conclusion that it was not general industry knowledge, reverse engineering or coincidence that defendants' friction hinge was only a slight variation of GCC's hinge design. Rather, the jury could have reasonably concluded that defendants misappropriated the dimensional relationships between specific elements or components, the sequencing and/or juxtaposition of parts or procedures employed by GCC, which utilized its selection and application of particular engineering principles and its own trial and error experience in conceiving and implementing its confidential hinge design, the composite of which constitutes GCC's "trade secrets."

It is not the Court's province in deciding a Rule 50(b) motion to consider the credibility of testimony or the weight to be given evidence. Instead, the Court must determine whether there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or whether the evidence in defendants' favor is so overwhelming that reasonable persons could not render a verdict against it. Although defendants introduced evidence that

particular elements of GCC's friction hinge design were not confidential, from which they argue the jury could not have reasonably concluded that defendants misappropriated any GCC trade secret, plaintiff's evidence that the nature of plaintiff's research efforts and costs and its efforts to maintain the confidentiality of the resulting combination of elements and processes could support a finding of confidential trade secret, such that defendants' knowledge of this design and production of nearly identical hinges could be found to be misappropriation of GCC's trade secrets. Therefore, viewing the evidence in the light most favorable to plaintiff, it cannot be said as a matter of law that the evidence was such that it reasonably only permitted a conclusion in defendants' favor on the existence of trade secret or its misappropriation by defendants. Accordingly, defendants' Motion for Judgment as a Matter of Law is denied as to the jury's CUTSA verdict against them.

## B. CUTSA DAMAGES FOR UNJUST ENRICHMENT AGAINST LOWRY AND CEMA

### 1. *CEMA'S Unjust Enrichment*

■ At the close of evidence in the damages phase of the trial, the Court instructed the jury that there were two theories under which it could award damages to plaintiff, actual damages and unjust enrichment.

Now, I indicated I would give you further instruction on the element of damages called unjust enrichment. With respect to the damages for defendants' violations of the Connecticut Uniform Trade Secrets Act, CUTSA, in addition to determining what actual damages General Clutch suffered, you may also consider what benefit the defendants have gained from misuse of the trade secrets. Regardless of whether you find that General Clutch itself suffered losses, if you find that the defendant benefitted from using a trade secret belonging to plaintiff, then you may award the monetary value that you attribute to those benefits as the measure of the plaintiff's damage.

These two approaches to damages, actual damages and unjust enrichment, are different in some respects, but may also overlap. That is; it may be that the defendant profited from particular sales that the plaintiff would have made had the defendant not competed using trade secrets. Now, in that situation, the two ways of approaching damages that I've just described would measure the identical damages, whether viewed as plaintiff's loss or defendant's gain. The law does not permit a plaintiff to recover twice for the same damages. Thus, you may include as damages both plaintiff's losses and defendant's gain only if and to the extent that they do not overlap in this way.

(Damages Tr. at 483–84). Defendant argues that GCC's trial witnesses offered no evidence demonstrating the unjust enrichment of CEMA, pointing to Dr. Mechner's "general" testimony that GCC suffered damages of $22 million as a result of the misappropriations of its trade secrets by CEMA and Mr. Lowry. (Damages Tr. at 94). Defendants also contend that the conclusion of GCC's expert, Mr. Helming that GCC claims damages equaling CEMA's gross profits on sales of friction hinges using GCC's trade secret technology lacks basis.

As the Court has previously stated in ruling on defendants' Rule 50(a) motion at trial, both sides' experts in this case have agreed that misappropriation of trade secrets can be a cause of lost profits, and that "[t]he methodology that was used by the plaintiff's expert based on the parties' own documents and business records is a methodology whose basis was testified to from an accounting standpoint and it is up to the jury to assess as to the weight it wishes to give that testimony." (Damages Tr. at 462). As to the testimony of Mr. Helming, the Court concluded "Mr. Helming's testimony with respect to the input of Dr. Waine was that it was corroborative, it confirmed his conclusions based on the documentary analysis and, therefore, was not the sole basis for his opinions. This matter [ ] has sufficient evidence to go to the jury and I'm going to deny the motion on that basis." (*Id.*). The Court further concluded "[w]ith respect to unjust enrichment, the Court concludes there is a legally sufficient evidentiary basis to dispute

whether the R & D and other overhead was or was not directly attributable to the production or the sale of the misappropriated technology and, accordingly, that is entirely a proper thing for the jury to weigh and assess both in terms of the documents and the credibility of witnesses." (Damages Tr. at 465–66).

Indeed, Mr. Lowry's testimony indicates that CEMA received over $500,000 in revenue from hinge sales to customers such as Apple Computer and Acer. (Damages Tr. at 142–43). Further, plaintiffs produced evidence that CEMA's business plan capitalized on Mr. Lowry's and Mr. Novin's confidential relationship with GCC in order to induce investment into the company. (Tr. at 1564–65). In short, where the jury was instructed that it could measure CEMA's unjust enrichment in terms of its profits from particular sales that GCC would have made had CEMA not competed using its trade secrets, it cannot be said that there was a complete absence of evidence on which the jury could have based its unjust enrichment verdict against CEMA. Moreover, to the extent defendants argue that CEMA's profits must be considered only after deduction of all its costs, it was *defendants'* trial burden to demonstrate costs that could be properly offset against its revenues in order to arrive at the final calculation of defendants' unjust enrichment, as the Court instructed the jury. (Damages Tr. at 484–85).

Given the evidence of CEMA's sales of similar hinges, the jurors could have reasonably weighed that evidence, along with the expert witness credibility and saliency to reach their verdict, and defendants have failed to demonstrate that they are entitled to judgment as a matter of law applying applicable legal standards. Accordingly, defendants' Motion for Judgement as a Matter of Law is denied as to the jury's $250,000 unjust enrichment award against CEMA.

### 2. Mr. Lowry's Unjust Enrichment

█ Defendants argue that the jury's $100,000 unjust enrichment verdict against Mr. Lowry is unsupported by any trial evidence such that reasonable jurors could not have returned that verdict. In particular, defendants point to Mr. Lowry's testimony that his salary from CEMA was less than the salary he received while employed by GCC (Damages Tr. at 185), and that his investment in CEMA was likely worth nothing. (Damages Tr. at 175–84, 186, 191–93, 197). Additionally, defendants claim that the value of Mr. Lowry's CEMA stock would be lessened by the unjust enrichment verdict against CEMA because the stockholder's equity would be lessened, and that Mr. Lowry had his equity reduced by the extent to which CEMA had been unjustly enriched. From this, defendants argue that an unjust enrichment damages award against Mr. Lowry would be an impermissible duplication of damages.

The Court is unpersuaded that the proper measure of unjust enrichment is a comparison with Mr. Lowry's salary at GCC since even one dollar improperly obtained may constitute unjust enrichment. Mr. Lowry testified that he owns 1,136,612 shares in CEMA for which investors paid $1.50 per share, (Damages Tr. at 191), and in fact testified that he would not sell his CEMA shares for $1.00 each, which refusal suggests that the shares had some value. (*Id.* at 192). In short, despite Mr. Lowry's testimony that there was no ready market for his CEMA stock, (*Id.* at 191), in performance of its credibility assessment and evidentiary weighing function, the jury could reasonably have concluded that the potential market value of these shares was between $1,136,612 and $1,704,918, and that this value was attributable to Mr. Lowry's formation of CEMA using GCC trade secrets technology. Accordingly, the Court cannot conclude that there was an absence of trial evidence supporting the jury's award of $100,000 in unjust enrichment damages against Mr. Lowry. Further, the Court finds unconvincing defendants' argument that GCC recovered twice for the same unjust enrichment damage from CEMA and Mr. Lowry in light of the Court's instruction to the jury regarding duplication of damages. *See Shannon v. United States,* 512 U.S. 573, 585, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (holding that there is an "almost invariable assumption of the law that jurors follow their instructions"). Conse-

quently, defendants' Motion for Judgement as a Matter of Law is denied as to the jury's $100,000 unjust enrichment award against Mr. Lowry.

## C. CUTPA CLAIM AGAINST MR. LOWRY

■ Defendants contend that GCC failed to offer any evidence of deceptive trade practices by Mr. Lowry, subsequent to termination of the employment with GCC, which would support its verdict of CUTPA liability and its $10,000 damages verdict against him on that claim. Defendants correctly state that CUTPA liability cannot arise from an employer-employee relationship. *See Quimby v. Kimberly Clark Corp.*, 28 Conn.App. 660, 670, 613 A.2d 838 (1992). Additionally, in ruling on plaintiff's motion for attorneys fees and punitive damages, the Court has noted that, as to Mr. Lowry, the jury awarded $10,000 in actual damages for the CUTPA violation, but awarded nominal actual damages for the CUTSA violation, suggesting that Mr. Lowry's CUTPA liability was premised on conduct distinct from the misappropriation of trade secrets.

However, plaintiff introduced the following evidence of Mr. Lowry's post-GCC employment activities which the jury could have concluded were unfair and deceptive (1) Mr. Lowry testified that he submitted a CEMA drawing containing a design similar to GCC's confidential Dell II hinge to one of GCC's subcontractors, Miniature Casting, under the alias "Allen Lowry" to get the "general approach" even though CEMA had no actual customers at the time (Tr. at 1526), (2) Mr. Lowry testified that he traveled to Asia (Japan and Taiwan) on CEMA's behalf eight months after leaving GCC to investigate market opportunities for friction hinges, having retained and never disclosed to GCC the existence of the Sumitomo and Deico reports (Tr. at 1590–91), (3) Mr. Cossentine's testimony that Mr. Lowry's failure to inform GCC about the Taiwan market prevented GCC from effectively competing there, and that not getting into competition there earlier, i.e., "on the ground floor," made obtaining hinge upgrade business more difficult for GCC. (Tr. at 527–28).

In view of this post-employment evidence of Mr. Lowry's activities, the jury could have reasonably concluded that Mr. Lowry used a false name (albeit not a very convincing one) at Miniature Casting in order to obtain GCC price and costing information, and that he went to Asia with reports requested by GCC, but not given to them, in order to get a head start for CEMA on entering the friction hinge competition in the Asia market. Therefore, it cannot be said that there is a "complete absence of evidence" supporting the jury's finding that Mr. Lowry was liable under CUTPA such that it could only have been the result of "sheer surmise and conjecture." *See Luciano*, 110 F.3d at 214. Moreover, although the Court found that plaintiff's submissions supporting its motion for attorneys fees and punitive damages under CUTPA did not specify upon what evidence the jury's CUTPA damages award of $10,000 against Mr. Lowry was based, the Court concludes that plaintiff now has analyzed its CUTPA evidence with sufficient specificity to support the jury's damages verdict. Accordingly, defendants' Motion for Judgment as a Matter of Law is denied as to the jury's finding of CUTPA liability, and the $10,000 damage award thereon, against Mr. Lowry.

## D. BREACH OF FIDUCIARY DUTY VERDICT AGAINST MR. LOWRY

■ Defendants contend that GCC did not produce sufficient evidence to support the jury's verdict finding that Mr. Lowry breached his fiduciary duty to GCC and awarding plaintiff $10,000 in damages thereon. Defendants note that, as the Court instructed the jury, an employee may make preparations to compete in the future with his or her employer even while remaining in its employ and that the evidence showed that Mr. Gelfand and Mr. Novin, who was recruited to leave GCC to join CEMA, were already looking for jobs outside GCC. Defendants also contend that the trial evidence showed that Mr. Lowry instructed both of them to take no actions which may harm GCC. (Tr. at 446–49, 1634–37).

Much of the evidence already discussed supports the jury's verdict that Mr. Lowry

breached his fiduciary duty to GCC: (1) evidence that Mr. Lowry misappropriated GCC trade secrets, (2) evidence that Mr. Lowry continually withheld from GCC the Sumitomo and Deico reports and customer list, and used them to prepare the business plan for CEMA as early as November of 1992, (3) evidence that Mr. Lowry brought Mr. Novin on a visit to GCC customers, including Dell in October of 1992, and (4) evidence that Mr. Lowry recruited Mr. Novin and Mr. Gelfand, both GCC engineers, while Mr. Lowry was employed at GCC. Although defendant developed alternate explanations of this evidence, it is the jury and not the Court that is charged with making credibility and weight determinations.

■ Defendants also posit that the trial evidence does not support the jury's $10,000 damages verdict against Mr. Lowry on this claim because, to the extent that Mr. Gelfand testified that GCC had to raise his salary by $15,000 in order to induce him to remain in its employ and not join CEMA, GCC gave Mr. Gelfand a raise because he "was grossly underpaid" and could not support his family on his $30,000 GCC salary. (Defs.' Reply at 8). *See* Tr. at 444–45. Once again, it is for the jury to test the credibility of the testimony and weigh the evidence, and it is not unreasonable for the jury to have concluded that a precipitating factor in GCC's increase in Mr. Galfand's salary was to offset his recruitment by Mr. Lowry, who at the time had a fiduciary duty to GCC.

Therefore, viewing the evidence in the light most favorable to plaintiff, it cannot be said that the jury's verdicts finding that Mr. Lowry breached his fiduciary duty to GCC and awarding $10,000 damages against him, were unreasonable. Defendants' Motion for Judgment as a Matter of Law is denied.

## E. IMPROPER COMMENTS BY PLAINTIFF'S COUNSEL

■ At the damages phase of the trial, the Court precluded evidence of a $20,000 bonus received by Mr. Lowry from GCC. Notwithstanding the Court's ruling, GCC's counsel commented on this bonus to the jury during his closing argument. On defendants' motion, the Court struck these comments on and immediately instructed the jury:

Ladies and gentlemen, with respect to the item of a $20,000 bonus, that is not an item of recovery for your consideration.

(Damages Tr. at 504). Defendants now contend that because the jury's total verdict against Mr. Lowry for actual damages was $37,000, and because GCC asked for actual damages of $17,000 for breach of the employment agreement (representing Mr. Lowry's salary), the jury's damages verdict was based on the improper remarks concerning the $20,000 bonus. Thus, defendants claim that the prejudicial comments were not remedied by the Court's curative instruction, and the total actual damages verdict against Mr. Lowry must be reduced by $20,000. The Court disagrees.

Although defendants find it significant that the jury's actual damages award against Mr. Lowry totals $37,000, which could be interpreted to suggest that the jury awarded GCC recoupment of the $20,000 bonus, as well as the $17,000 salary ($20,000 + $17000), this is clearly not the only explanation. In fact, question number VI.A.1. on the Verdict Form, to which the jury responded "$37,000," asks for the "[t]otal actual losses caused only by David Lowry." A review of the Verdict Form makes clear that the sum of the total losses caused only by David Lowry is $37,000:

| Question I.A.1. | (CUTSA actual damages) | $ 0 |
| Question II.A. | (CUTPA actual damages) | $10,000 |
| Question III. | (Breach of employment agreement) | $10,000 |
| Question IV. | (Breach of implied covenant) | $ 7,000 |
| Question V. | (Breach of fiduciary duty) | $10,000 |

In sum, the Court instructed the jury not to consider the $20,000 bonus in its calculation of damages against Mr. Lowry, and juries are presumed to follow their instructions. *See Shannon*, 512 U.S. at 585, 114 S.Ct. 2419. Notwithstanding the arguably

coincidental sum total figure, the Verdict Form supports the conclusion that the jury's calculation of $37,000 in total actual damages against Mr. Lowry was exclusive of the bonus. Accordingly, defendants' Motion for Judgment as a Matter of Law is denied.

## F. OVERLAPPING OR DUPLICATIVE DAMAGES

■ Defendants claim that because GCC relied on the same evidence of conduct by Mr. Lowry to prove its claims of breach of fiduciary duty, breach of the employment agreement and breach of the implied covenant of good faith and fair dealing, the jury's damage awards against Mr. Lowry on those counts were impermissibly duplicative and must be stricken. Defendants contend that because the conduct evidence was the same for each count, GCC failed to prove why damages for one violation did not fully compensate it for *all* of this conduct.

GCC concedes that the same factual evidence supports its claims for breach of fiduciary duty, breach of the employment agreement and breach of the implied covenant of good faith and fair dealing. (Pl.'s Mem. at 16–18). However, the Court instructed the jury not to duplicate its damages awards:

> Now duplication of damages is something I want you to pay particular attention to, although obviously you take the instructions as a whole. General Clutch has asserted a number of claims for damages in this case. Many of these claims seek the same type of actual damages which is the lost profits and earnings. Even if you find that General Clutch has proven that it suffered damages, you may not award General Clutch more in compensatory damages than will reasonably compensate it for the injury or the loss that it has suffered.
>
> Therefore, if you find that any compensatory damages should be awarded to General Clutch, you should review your jury verdict form, which I will explain to you after the lawyers have made their closing arguments, to make sure that the total amount of compensatory damages that you may award is not more than the amount that you all agree would reasonably com-

pensate General Clutch for any loss it has suffered.

(Damages Tr. at 476–77). The jury awarded $10,000 in actual damages against Mr. Lowry for breach of his employment agreement and $7,000 in actual damages for breach of the implied covenant of good faith and fair dealing. It is obvious to the Court that this careful and conscientious jury apportioned the damages it found GCC suffered between the two counts, which were supported by the same factual evidence. This total figure, $17,000, is the amount of Mr. Lowry's salary paid by GCC while Lowry was setting up his competitive enterprise.

Additionally, it is well-established that Mr. Lowry's status as a fiduciary of GCC required a higher standard of behavior than that required by his employment agreement, one characterized by a unique degree of trust and confidence between two parties, one of whom, Mr. Lowry, was under a duty to represent the interests of the other. *See Dunham v. Dunham,* 204 Conn. 303, 322, 528 A.2d 1123 (1987). Thus, it cannot be said to be unreasonable that the jury concluded GCC suffered additional damage as a result of Mr. Lowry's breach of trust, of a different type than the damage suffered from his violation of the employment agreement, such as the loss of Mr. Novin and increased cost of Mr. Gelfand.

In view of the foregoing, the Court concludes that defendants have demonstrated nothing which would undermine the Court's "almost invariable assumption of the law" that this careful and methodical jury followed the Court's instruction not to duplicate damages. Defendants' Motion for Judgment as a Matter of Law is denied as to the jury's verdicts on GCC's claims of breach of fiduciary duty, breach of the employment agreement and breach of the implied covenant of good faith and fair dealing.

## IV. CONCLUSION

Defendants' Motion for Judgment as a Matter of Law [docs. # 150–1, # 150–2] is

DENIED in its entirety. The Clerk is directed to close these cases.

IT IS SO ORDERED.