# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3909

_____

United States of America,

          Appellee,

v.

Edward Frank Brewer,

          Appellant.

*
*
*
*
*   Appeal from the United States
*   District Court for the
*   Northern District of Iowa.
*
*
*

_____

Submitted: June 18, 2010
Filed: October 21, 2010

_____

Before LOKEN, BRIGHT, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Edward Brewer was convicted after a jury trial of conspiracy to distribute crack cocaine, distribution of crack cocaine, and possession with intent to distribute crack cocaine. *See* 21 U.S.C. §§ 841(a)(1) and 846. The district court[1] sentenced Brewer to 370 months' imprisonment and 10 years of supervised release. Brewer appeals his convictions and sentence. For the following reasons, we affirm.

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

## I.     BACKGROUND

In September 2008, Kelly Meggers, an Iowa Division of Narcotics Enforcement Special Agent, arranged to buy crack cocaine from Brewer, a suspected drug dealer, with the help of a Drug Enforcement Administration ("DEA") confidential source ("CS"). The CS called Brewer and introduced him to Agent Meggers over the phone. Agent Meggers arranged for the CS to meet Brewer on September 19, 2008, in order to buy a bag of crack cocaine. During the conversation, Brewer warned that he always has "a second set of eyes watch [his] back" during such deals.

On September 19, after strip searching the CS and equipping her with a digital recording device, Agent Meggers provided the CS with prerecorded buy money and drove her to the appointed location, a mall parking lot. A surveillance team consisting of DEA agents and Cedar Rapids Police Department officers was already in place at the parking lot. Brewer arrived in a white van and sold approximately 13.2 grams of crack cocaine to the CS for $800.

Following the sale, Brewer drove the white van away from the mall. Having learned ahead of time that Brewer's driver's license was suspended, Officer Dale Moyle requested that a patrol officer in a marked car stop Brewer. Officer Jeff Herbert pulled Brewer over. At least two other patrol cars arrived on the scene, and Brewer was arrested for driving with a suspended license. During the stop, Officer Chip Joecken recovered the $800 in prerecorded cash used in the undercover buy.

That same evening, Agent Meggers called Brewer to tell him that she was pleased with the crack cocaine and to arrange another purchase the following week. Despite what Brewer described as "the drama" of being arrested, he agreed to sell her more crack. In a series of recorded phone calls, Meggers asked to buy "two of them" at "8 a pop," meaning that she wanted to purchase two $800 bags of crack cocaine.

During a September 23, 2009 phone call, Brewer directed Agent Meggers to go to the same mall parking lot, where he told her she would find a cup on the ground. Brewer instructed Meggers to retrieve a bag of crack cocaine hidden inside the cup and to leave the money under a nearby rock. Before the transaction, surveillance officers observed a purple Grand Am driven by Brewer's girlfriend, Rosina Rhodes, stop in a nearby Burger King parking lot. Rhodes opened the car door and picked up a Burger King cup that was lying on the ground. Later, when Agent Meggers approached the area of the parking lot identified by Brewer, she found a Burger King cup with 27 grams of crack cocaine in it. Meggers left $1,600 in prerecorded buy money under a nearby rock, as instructed.

On September 30, 2008, Agent Meggers met Brewer in the parking lot of an apartment complex to buy more crack cocaine. When Meggers arrived, Brewer got in her truck and, without speaking, pulled a bag containing approximately 29 grams of crack cocaine out of his front pocket and placed it in the cupholder. Meggers paid Brewer, after which he promptly exited her vehicle and walked away. Rhodes picked Brewer up and drove away from the parking lot irregularly—doubling back over streets and making U-turns—in an apparent attempt to avoid being followed.

In subsequent recorded phone calls, Agent Meggers arranged to buy more crack cocaine from Brewer on October 9, 2008. Once again, surveillance officers positioned themselves in various places in the mall parking lot to observe the transaction. Shortly before noon, Rhodes parked her purple Grand Am in the lot. Twenty minutes later, Brewer drove up. After speaking briefly with Rhodes, Brewer drove away. Rhodes remained in her car, watching the area of the parking lot where the Burger King cup had been left on September 23. Brewer then met Agent Meggers on the opposite side of the mall. Brewer got into Meggers's truck, and she drove him to a different part of the parking lot. Brewer told her that he would reveal where the crack cocaine was hidden after she paid him in full. Meggers balked at this request, but Brewer remained steadfast. During their conversation, Brewer barely talked above a whisper and

repeatedly turned up the radio. Agent Meggers later testified that Brewer was wearing a Bluetooth headset, which he appeared to be using to speak with someone else. Agent Meggers refused to pay without seeing the crack cocaine, and Brewer refused to show her the crack before she gave him the money. After about twenty minutes, Meggers drove Brewer back to his car.

Brewer was arrested as soon as he exited Meggers's truck. The arresting officers recovered two cell phones from Brewer. They also found a Bluetooth headset on the ground nearby. Using cell phone records, Agent Meggers later discovered that Brewer had been on the phone with Rhodes while he was in Meggers's truck.

While Brewer was being arrested, several officers approached Rhodes, who had been sitting in her car for nearly an hour. Rhodes consented to a search of her car and told the officers they would find a handgun in the trunk. The officers found the gun, which was loaded, in a case. The gun had a trigger lock on it. In a post-arrest interview, Brewer admitted that he knew Rhodes had purchased the handgun and that she always kept it in her trunk. Agent Meggers later searched the area of the parking lot that Rhodes had been watching and found approximately 83 grams of crack cocaine in a plastic shopping bag.

A federal grand jury returned a four-count indictment charging Brewer with various drug offenses. The grand jury later returned a five-count superseding indictment charging Brewer with conspiring with Rhodes to distribute fifty grams or more of crack cocaine (Count I), distribution of five grams of more of crack cocaine (Counts II, III, and IV), and possession with intent to distribute fifty grams or more of crack cocaine (Count V).

Brewer moved to suppress the $800 seized during the September 19, 2008 traffic stop. Following a suppression hearing, the magistrate judge recommended

denying Brewer's motion. The district court adopted the magistrate judge's report and recommendation and denied Brewer's motion to suppress.

The case proceeded to trial, and the jury found Brewer guilty on all counts. At sentencing, the district court found that Brewer's base offense level was 32. The district court denied Brewer's request for a two-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, and applied a two-level enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1.[2] The court also applied two-level enhancements for role in the offense, *see* U.S.S.G. § 3B1.1(c), and for possession of a firearm in connection with the offense, *see* U.S.S.G. § 2D1.1(b)(1). As a result, the district court determined that Brewer's total offense level was 38 and, with a criminal history category of V, that Brewer's advisory guidelines range was 360 months to life. The court sentenced Brewer to 370 months' imprisonment, to be followed by 10 years of supervised release.

## II.    DISCUSSION

Brewer first challenges the denial of his motion to suppress. "We examine the factual findings underlying the district court's denial of the motion to suppress for clear error and review *de novo* the ultimate question of whether the Fourth Amendment has been violated." *United States v. Estey*, 595 F.3d 836, 839-40 (8th Cir.) (quoting *United States v. Williams*, 577 F.3d 878, 880 (8th Cir. 2009)), *cert. denied*, 560 U.S. ----, 130 S. Ct. 3342 (2010). "In 'reviewing the denial of a motion to suppress, we must examine the entire record, not merely the evidence adduced at the suppression hearing.'" *United States v. Anderson*, 339 F.3d 720, 723 (8th Cir. 2003) (quoting *United States v. Martin*, 982 F.2d 1236, 1240 n.2 (8th Cir. 1993)).

---

[2]The obstruction-of-justice enhancement was based on the district court's finding that Brewer committed perjury when he testified that, among other things, he was selling video games, not crack cocaine, to Agent Meggers.

Brewer argues that the police did not have probable cause to stop or arrest him on September 19, 2008, and that the search of his vehicle incident to his arrest was invalid. As an initial matter, we reject Brewer's claim that the stop and arrest were improper. We have held that "[i]f an officer determines that a person is driving on a suspended license, then the officer has probable cause to arrest." *United States v. Jones*, 479 F.3d 975, 978 (8th Cir. 2007). Here, Officer Moyle saw Brewer drive away from a drug transaction at the mall and, having already determined that Brewer had a suspended license, *see* Iowa Code § 321.218, requested that a patrol officer stop Brewer. Accordingly, we conclude that Officer Herbert had probable cause to stop and arrest Brewer for driving with a suspended license. *See Jones*, 479 F.3d at 978.

Brewer's second point is somewhat more nettlesome. Citing the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. ----, 129 S. Ct. 1710 (2009), Brewer argues that the search of his van was not a valid search incident to arrest because, after he exited the van and was arrested, the arresting officers could not have reasonably believed that he could access the interior of the van. Therefore, according to Brewer, the $800 in prerecorded buy money seized during the search must be suppressed.

The Supreme Court has repeatedly held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *See, e.g.*, *Gant*, 129 S. Ct. at 1716 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is a search incident to a lawful arrest. *Id.* Following a lawful "custodial arrest," a search of the arrestee's person incident to arrest "requires no additional justification." *United States v. Robinson*, 414 U.S. 218, 235 (1973). The search of a vehicle is different, however—the Supreme Court held in *Gant* that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant*, 129 S. Ct. at 1723.

-6-

Brewer's argument is premised on the assertion, which he makes for the first time on appeal, that the police seized the cash from his van. In his motion to suppress, Brewer asserted that the cash was found in his pants pocket.[3] At the suppression hearing, however, DEA Officer Moyle, who was part of the surveillance team at the mall during the September 19 transaction, testified that the cash was seized from Brewer's van. The magistrate judge credited Officer Moyle's testimony and found that the cash was seized from the van.

As noted, we review the entire record, including the evidence adduced at trial, in reviewing the denial of a motion to suppress. *See Anderson*, 339 F.3d at 723. The Supreme Court has stated that when a district court's factual "finding is based on his decision to credit the testimony of one or two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). In this case, Officer Moyle admitted in his testimony at the suppression hearing that he did not participate in the stop, arrest, or search of Brewer on September 19, 2008. Officer Moyle thus lacked firsthand knowledge about where the seized money was found. Officer Joecken, who searched Brewer incident to the September 19 arrest, did not testify at the suppression hearing. At trial, however, Officer Joecken testified that he found the $800 in Brewer's pants pocket. Brewer likewise testified at trial that the cash was seized from his pocket. Thus, the two participants in the search—Officer Joecken and Brewer—agreed that the $800 was seized from Brewer's person, thereby contradicting Officer Moyle's testimony. The district court adopted the magistrate judge's finding that the cash was seized from Brewer's van. After reviewing the entire record, we conclude that this is the rare case where the district court's factual finding based on a decision to credit the testimony of a witness was clearly erroneous. Because the

---

[3]The Supreme Court decided *Gant* after Brewer's trial and before this appeal. Brewer now claims that the money was seized from his van rather than from his person.

cash was seized from Brewer's pants pocket, the holding in *Gant* concerning when the police may search the passenger compartment of a vehicle incident to arrest does not apply. Here, the officers had probable cause to arrest Brewer, and we conclude that the search of his person was a valid search incident to arrest, *see Robinson*, 414 U.S. at 234.

Brewer next argues that the evidence was insufficient to support the jury's verdict. "We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the verdict, and we will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. McCraney*, --- F.3d ----, 2010 WL 2852970, at *3 (8th Cir. July 22, 2010) (citing *United States v. Scofield*, 433 F.3d 580, 584-85 (8th Cir. 2006)).

Brewer does not argue that the Government failed to prove beyond a reasonable doubt any specific element of any of the offenses for which he was convicted. Instead, Brewer broadly contends that "the government witnesses did not tell the truth and the government's evidence is inconsistent," and that the "cumulative effect" of these alleged untruths and inconsistencies "establish[es] that the verdict should be set aside." We have held that "[c]redibility determinations by a jury are 'virtually unassailable on appeal.'" *United States v. Nguyen*, 608 F.3d 368, 376 (8th Cir. 2010) (quoting *United States v. Vickers*, 528 F.3d 1116, 1120 (8th Cir. 2008)). And we have held that "we must presume that the trier of fact resolved any conflicts in favor of the Government." *United States v. Littlewind*, 595 F.3d 876, 882 (8th Cir. 2010) (citing *United States v. Water*, 413 F.3d 812, 816 (8th Cir. 2005)). Because we will not substitute our view of the evidence for the jury's decision, *see United States v. Triplett*, 104 F.3d 1074, 1080 (8th Cir. 1997), we reject Brewer's sufficiency of the evidence claim, *see Nguyen*, 608 F.3d at 376.[4]

---

[4]In connection with this claim, Brewer argues that his attorney was constitutionally ineffective for failing to present the "arsenal of evidence" at his disposal, which, according to Brewer, "could have been used to challenge the

In any event, it is clear that the evidence against Brewer was compelling. Agent Meggers testified at length about arranging and executing multiple controlled buys of crack cocaine from Brewer; much of Meggers's testimony was corroborated by audio and visual recordings. Various law enforcement officials testified that they witnessed Brewer's interactions with the CS and Agent Meggers as well as Rhodes's involvement. And abundant physical evidence—including several bags of crack cocaine, the prerecorded buy money, and the Burger King cup—tied Brewer to the crack cocaine sales. It is beyond serious question that the evidence in this case was sufficient to sustain Brewer's convictions.

Brewer also argues that the district court abused its discretion in refusing to instruct the jury that Brewer faced a twenty-year mandatory minimum sentence if convicted on Counts I or V, and a ten-year mandatory minimum sentence if convicted on Counts II, III, or IV. *See United States v. Anderson*, 533 F.3d 623, 632 (8th Cir. 2008) ("This court reviews the denial or acceptance of a proposed jury instruction for abuse of discretion." (citing *United States v. Counce*, 445 F.3d 1016, 1019 (8th Cir. 2006))). The district court is not required to instruct a jury about the sentencing consequences of its verdict. *Shannon v. United States*, 512 U.S. 573, 575 (1994). Indeed, "providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* at 579; *see also United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990) ("To inform a federal jury about a defendant's punishment would only introduce improper and confusing considerations before it."). Accordingly, we find no abuse of discretion in the district court's refusal to instruct the jury about the punishment Brewer faced if convicted.

government's evidence." Such claims "are usually best litigated in collateral proceedings," *United States v. Ramirez-Hernandez*, 449 F.3d 824, 827 (8th Cir. 2006), and, as is generally true on direct appeal, the record in this case "is not sufficiently developed to let us pass on the merits of [this] claim," *id.* Thus, we decline to address Brewer's ineffective assistance of counsel claim. *See id.*

Brewer next challenges the district court's decision to impose a two-level enhancement for possession of a firearm based on its finding that Brewer possessed the firearm in Rhodes's trunk in connection with a drug trafficking offense. *See* U.S.S.G. § 2D1.1(b)(1). We review the district court's finding for clear error. *United States v. Braggs*, 317 F.3d 901, 904 (8th Cir. 2003) (citing *United States v. Atkins*, 250 F.3d 1203, 1213 (8th Cir. 2001)).

The loaded handgun at issue here was recovered from a case in Rhodes's trunk and was equipped with a trigger lock. Brewer first argues that he never had possession of the gun. "[P]ossession may be constructive, if it was reasonably foreseeable that a co-conspirator would have possessed a weapon." *Braggs*, 317 F.3d at 904. Under the guidelines, co-conspirators are generally responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(A). Here, Brewer was convicted, among other things, of conspiring with Rhodes to distribute crack cocaine (Count I).[5] And at Brewer's sentencing hearing, Officer Steven Warner, who seized the handgun from Rhodes's trunk, testified that Brewer admitted in a post-arrest interview that he knew that Rhodes owned a gun and that it was in the trunk of her Grand Am on October 9. Because Brewer and Rhodes conspired to distribute crack cocaine, Brewer's knowledge that Rhodes had the loaded gun in her car during the aborted October 9 transaction is sufficient to establish Brewer's constructive possession of the handgun. *See Braggs*, 317 F.3d at 904.

Brewer also argues that the handgun, which was indisputably present during the October 9 transaction, was not connected to the offense. To carry its burden of proving that the firearm enhancement should apply under § 2D1.1, "[t]he government

---

[5]Rhodes was tried separately and, following a mistrial, pled guilty to one count of using a communications device to facilitate a drug trafficking offense. *See United States v. Rhodes*, No. 09-3911, 2010 WL 2890590 (8th Cir. July 26, 2010) (unpublished per curiam).

must simply show that it is not clearly improbable that the weapon was connected to the drug offense." *United States v. Peroceski*, 520 F.3d 886, 889 (8th Cir. 2008); U.S.S.G. § 2D1.1 cmt. n.3. "[T]he government need not show that the defendant used or even touched [the] weapon to prove a connection between the weapon and the offense." *Id.* (quoting *United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (per curiam)).

While Brewer attempted to sell crack cocaine to Agent Meggers on October 9, 2008, Rhodes, sitting in her car, kept watch over Brewer's nearby stash of crack cocaine and stayed on the phone with Brewer, all while the loaded handgun remained in the trunk of her car. Under the circumstances, we cannot say that the district court clearly erred in finding that the gun was connected to Brewer's drug trafficking activities. *See United States v. Jones*, 327 F.3d 654, 657 (8th Cir. 2003) (concluding that "it was not clearly improbable that the firearms possessed by defendant facilitated, or had the potential to facilitate, the drug trafficking offense" because "[t]he police found the firearms and ammunition in the trunk of the same car where they found the cocaine base" (internal quotation marks omitted)); *Peroceski*, 520 F.3d at 889 ("The gun need not even be operable for it to be connected to the offense." (citing *United States v. Luster*, 896 F.2d 1122, 1128-29 (8th Cir. 1990))); *see also United States v. Heldberg*, 907 F.2d 91, 93 (9th Cir. 1990) (concluding that the presence of an unloaded firearm in a locked briefcase in the defendant's trunk was sufficient to justify a two-level enhancement under § 2D1.1(b)(1)).

Finally, Brewer challenges the reasonableness of his sentence, arguing that the district court should have granted a downward variance based on the sentencing disparity between crack and powder cocaine. "We review the reasonableness of a defendant's sentence under a 'deferential abuse-of-discretion standard,' ensuring that the district court committed no significant procedural error and that the sentence is substantively reasonable." *United States v. Midkiff*, --- F.3d ----, 2010 WL 2790937, at *12 (8th Cir. July 16, 2010) (quoting *Gall v. United States*, 552 U.S. 38, 52 (2007)).

-11-

The Supreme Court held in *Kimbrough v. United States*, 552 U.S. 85 (2007), that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve [18 U.S.C.] § 3553(a)'s purposes," *id.* at 110. *See also Spears v. United States*, 555 U.S. ---, 129 S. Ct. 840, 843-44 (2009) (per curiam) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."). Following *Kimbrough* and *Spears*, we have consistently held that district courts are not required to vary downward based on the crack/powder disparity in the advisory guidelines. *See, e.g.*, *United States v. Woods*, 603 F.3d 1037, 1040 (8th Cir. 2010); *United States v. Davis*, 583 F.3d 1081, 1099 (8th Cir. 2009), *cert. denied*, 559 U.S. ---, 130 S. Ct. 1555 (2010). Here, the district court considered and rejected Brewer's request for a variance based on the crack/powder disparity. Thus, "[t]he district court was well within its discretion not to vary downward." *See Davis*, 583 F.3d at 1099.[6]

## III.   CONCLUSION

For the foregoing reasons, we affirm Brewer's convictions and sentence.[7]

---

[6]Brewer also argues that the district court committed a procedural error by failing to adequately explain its decision not to vary downward based on the crack/powder disparity. (Brewer does not argue that the district court believed that it lacked the authority to vary based on the crack/powder disparity.) Because he raises this claim for the first time on appeal, our review is for plain error. Brewer thus bears the burden of showing, among other things, that "there is a reasonable probability [he] would have received a lighter sentence but for the error." *See United States v. Bain*, 586 F.3d 634, 640 (8th Cir. 2009) (per curiam) (citing *United States v. Pirani*, 406 F.3d 543, 552 (8th Cir. 2005) (en banc)). Brewer has not attempted to make such a showing, so his plain error claim necessarily fails. *See United States v. Chauncey*, 420 F.3d 864, 878 (8th Cir. 2005).

[7]Pending before us is Brewer's motion to file a *pro se* supplemental reply brief. We generally do not consider *pro se* arguments raised by defendants who are

BRIGHT, Circuit Judge, concurring in part and dissenting in part.

I concur in the denial of the motion to suppress and affirmance of Brewer's convictions but dissent as to the sentence.

Who could have guessed that President Eisenhower's decision nearly sixty years ago to create a national system of interstate highways would have an effect on sentencing in Iowa today? Well, it has. In the Northern District of Iowa, cases arising on one side of the interstate go to one district court judge while cases arising on the other go to a second judge. And one active judge uses a 1:1 ratio between crack and powder cocaine when sentencing violators of crack cocaine laws while the other

_____

represented by counsel on appeal. *See, e.g.*, *United States v. Moore*, 481 F.3d 1113, 1114 n.2 (8th Cir. 2007). Because we granted Brewer's earlier motion to file a *pro se* supplemental brief, we exercise our discretion to grant his motion to file a supplemental reply brief. However, after considering his supplemental briefs, we conclude that the arguments he raises *pro se* are uniformly without merit. *See United States v. Williams*, 599 F.3d 831, 834 n.3 (8th Cir.), *cert. denied*, 559 U.S. ---, 130 S. Ct. 2134 (2010). We deny Brewer's motion for production of documents and his motion to supplement the record. In addition, on August 27, 2010, Brewer's counsel submitted a letter pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure arguing that Brewer is entitled to resentencing under a retroactive application of the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (Aug. 3, 2010). We note that Rule 28(j) letters are to be used only to call our attention to significant authorities unknown to the parties pre-argument, should refer to the relevant page of the party's brief or point argued orally, and should not contain argument. Fed. R. App. P. 28(j). We disregard the submission to the extent it includes material outside these limitations. *See Davis v. U.S. Bancorp*, 383 F.3d 761, 763 (8th Cir. 2004). In any event, the letter raises no issues of import because the Fair Sentencing Act contains no express statement that it is retroactive, and thus the "general savings statute," 1 U.S.C. § 109, requires us to apply the penalties in place at the time the crime was committed. *See United States v. Brown*, No. 10-1791, 2010 WL 3958760, at *1 (8th Cir. Oct. 12, 2010) (unpub.); *United States v. Gomes*, --- F.3d ----, 2010 WL 3810872, at *2 (11th Cir. Oct. 1, 2010) (per curiam); *United States v. Carradine*, --- F.3d ----, 2010 WL 3619799, at *4-5 (6th Cir. Sep. 20, 2010).

follows the sentencing guidelines – which here applied a 33:1 ratio.[8]  So in the Northern District of Iowa, the location of the crime relative to the interstate is a significant factor in crack cocaine sentencing.  In my view, the difference in sentences between similar offenders should not depend on which side of the interstate a crime was committed or where the offender was arrested.  *See United States v. Ayala*, 610 F.3d 1035, 1037-38 (8th Cir. 2010) (Bright, J., concurring) (discussing the need to reduce sentencing disparity in the post-*Booker* era).

For Brewer's crime of possessing, conspiring, and delivering approximately 150 grams of crack cocaine, the guidelines recommended a sentence of 30 years to life.[9]  That's the same recommendation as if Brewer had committed second-degree murder.  Unfortunately, equating crack cocaine with murder is not uncommon.  *See* Robert Perkinson, *Texas Tough: The Rise of America's Prison Empire* 336 (Metropolitan Books 2010) (*Texas Tough*) ("In 1995, the average federal prison term for a crack offense surpassed that of murder.").  Brewer requested a variance from the harsh crack cocaine guidelines on the basis of the disparity with powder cocaine and he cited a decision by Judge Bennett of the Northern District of Iowa who utilizes a 1:1 crack/powder ratio.[10]

_____

[8]After the Sentencing Commission's 2007 revisions to the Guidelines, the crack/powder ratio varies between 25 to 1 and 80 to 1.  *Kimbrough v. United States*, 552 U.S. 85, 106 (2007).  The Commission is currently contemplating revisions to the Guidelines pursuant to the Fair Sentencing Act of 2010.

[9]Brewer's base offense level was 32, his total offense level was 38, and his criminal history category was V.  By way of comparison, for the same amount of powder cocaine, the guidelines recommend a sentence of approximately eight to nine years.

[10]Brewer faced a 20-year mandatory minimum sentence, and so he asked the judge to vary down from 30 to 20 years.  Still a harsh sentence, but in this case, a sentencing court could go no lower absent Congressional action — which finally occurred on July 28, 2010, when President Obama signed the Fair Sentencing Act of

The court imposed a 370-month sentence. That's 30 years and 10 months.[11] The district court denied Brewer's request for a variance, stating "I did consider and reject the request for a variance based on the disparity in punishment between crack cocaine and cocaine. As I looked at the statutory factors under 18 U.S.C. 3553(a), I determined that, on balance, this sentence was not out of the range of reasonableness and is fully supported by the evidence."

The majority affirms, concluding that the district court was not required to vary downward on the basis of the crack/powder disparity. But I believe the district court's decision does not reflect a reasoned and informed exercise of discretion.[12] The district court cavalierly applied a guideline which often does not comply with § 3553(a) in the mine-run case, treats Brewer like a murderer, and results in unwarranted intra-district disparity. Sadly, the interstate and corresponding judicial assignment made a substantial difference at Brewer's sentencing.

---

2010. If this new law were applied, Brewer would face a 10-year mandatory minimum. *See* Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2, 124 Stat. 2372 (2010).

[11]Brewer, by the way, was 32 years old when sentenced, so he will be out of prison sometime near 2040, when he is 60 years old. At the current cost of incarceration, about $26,000 per year, taxpayers will have spent around $780,000 to imprison Brewer. *See* 74 Fed. Reg. 33,279 (July 10, 2009) (reporting that in 2008, the average annual cost of incarceration for federal inmates was $25,895). Did I mention that this sentence was for 150 grams of crack sold to government agents on four occasions?

[12]I note that sometimes our court does not even require sentencing judges to respond to a defendant's motion for a variance on the basis of the crack/powder disparity. *See United States v. Bowie*, __ F.3d __, 2010 WL 3325606, at *12-14 (8th Cir. 2010) (Bright, J. dissenting) (concluding the majority erred in affirming the district court's silence where the defendant properly sought a variance based on the crack/powder disparity).

-15-

Although the Supreme Court's recent sentencing jurisprudence emphasizes district court discretion, *see Gall v. United States*, 552 U.S. 38, 59-60 (2007), and particularly with respect to the crack/powder disparity, *see Kimbrough v. United States*, 552 U.S. 85, 110 (2007); *Spears v. United States*, 129 S. Ct. 840, 843-44 (2009), surely the Supreme Court has not meant to approve a sentencing world in which the assignment of a case to a specific judge becomes a meaningful and significant factor at sentencing.[13] The denial of a request for a variance on the basis of the crack/powder disparity should require more than a simple "No." How much more? At least some explanation of how a sentence predicated on the crack cocaine guidelines complies with the principal that a sentence be sufficient but not greater than necessary. *See* 18 U.S.C. § 3553(a). Why should this be the rule? For one, relying on the crack cocaine guidelines to recommend a sentence sufficient but not greater than necessary is suspect. *Compare Rita v. United States*, 551 U.S. 338, 347-48 (2007) (explaining the process by which the Commission attempts to carry out the § 3553(a) objectives "wholesale"), *with Kimbrough*, 552 U.S. at 109 (stating that the crack cocaine guidelines "do not exemplify the Commission's exercise of its characteristic institutional role"). For another, the need to avoid unwarranted disparity should call for district courts to consider and explain the imposition of a sentence inconsistent with other judges in the same federal district.

## A.     The Crack Cocaine Guidelines

The political climate surrounding the enactment of the Controlled Substances Act of 1986 (CSA) provides the first glimpse at how Congress and the Sentencing Commission created a crack cocaine sentencing scheme untethered to the goals of sentencing. As described by one insider, the political climate was "frenzied." Ryan

---

[13]Having reviewed criminal appeals from the Northern District of Iowa, as well as studied this court's opinions, this judge anecdotally observes that since *Booker* it appears one judge in this district frequently imposes below-guideline sentences while the other does so very rarely.

S. King & Marc Mauer, *Sentencing with Discretion: Crack Cocaine Sentencing After Booker* at 8 (Jan. 2006), http://www.sentencingproject.org/doc/publications/ dp_sentencing_cc_afterbooker.pdf. The CSA moved forward with "breakneck speed and little time for deliberation" in which "numbers were being pulled out of the air with no empirical foundation." *Id.* The process was a "political power game" where "politicians tried to one-up each other with calls for more severe penalties." *Id.* at 9 (quotation omitted).

The Sentencing Commission, notwithstanding the political power games underlying crack cocaine sentencing, adopted the 100:1 statutory ratio in creating the guidelines. *See* United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* at v (Feb.1995) (1995 Report). As observed by the Supreme Court, unlike the sentencing guidelines as a whole, the Commission "did not use [an] empirical approach in developing the Guidelines sentences for drug-trafficking offenses." *Kimbrough*, 552 U.S. at 96. This lack of an empirical approach to the creation of guidelines for crack cocaine counsels against according controlling, or even significant, weight to the guidelines. *See, e.g., United States v. Dorvee*, ___ F.3d ___, 2010 WL 3023799, at *11 (2d Cir. Aug. 4, 2010) (holding that deference to the Guidelines depends on the thoroughness of the Commission's analysis and the validity of its reasoning).

In its 1995 Special Report to Congress, the Sentencing Commission succinctly explained the problem: "the present 100-to-1 quantity ratio is too great." 1995 Report at iii. The ratio "creates anomalous results by potentially punishing low-level (retail) crack dealers far more severely than their high-level (wholesale) suppliers of the powder cocaine that served as the product for conversion into crack." *Id.* The Commission determined, "[d]espite the unprecedented level of public attention focused on crack cocaine, a substantial gap continues to exist between the anecdotal experiences that often prompt a call for action and empirical knowledge upon which

-17-

to base sound policy." *Id.* at vi. But Congress did nothing and left the federal courts to apply a guideline that had little persuasive force.

In 2002, the Commission again explained to Congress the unfairness of crack cocaine sentencing. The Commission found that quantity-based penalties (1) "overstate[] the relative harmfulness of crack cocaine" compared to powder cocaine; (2) "sweep too broadly" and "apply most often to lower level offenders[;]" (3) "overstate the seriousness of most crack cocaine offenses" and "fail to provide adequate proportionality[;]" and (4) the "current penalties' severity mostly impacts minorities[.]" United States Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* 93, 97, 100, 102 (May 2002) (2002 Report).[14]

_____

[14]The disproportionate impact of the crack cocaine guidelines on minorities should concern every federal judge, and provide another reason why guideline sentences for crack cocaine offenders warrant special attention. *See Texas Tough* at 336 ("By the early 1990s, nearly 90 percent of crack prosecutions targeted blacks, most of them low-level street dealers.").

The literature overwhelmingly establishes that minorities, especially African-American men, have unduly suffered from the harsh crack cocaine guidelines. "On any given day, nearly one-third of black men in their twenties are under the supervision of the criminal justice system – either behind bars, on probation, or on parole." Dorothy E. Roberts, *The Social and Moral Cost of Mass Incarceration in African American Communities*, 56 Stan. L. Rev. 1271, 1272 (2004) (Roberts); *see also* Carol A. Brook, *Racial Disparity Under the Federal Sentencing Guidelines*, 35 Litig., Fall 2008, at 1, 15. ("African-Americans alone make up almost 40 percent of the federal prison population, although they constitute only 13 percent of our country's population.").

The disparity between Caucasian and African-American drug offenders cannot be explained by rates of drug use: "[a]lthough whites have a higher rate of illegal drug use, 60% of offenders imprisoned for drug charges in 1998 were black." Roberts at 1275. "The increase in the rates of incarceration of young black males is due primarily to the focus of the 'war on drugs' on black drug users." David H. Angeli, *A "Second Look" at Crack Cocaine Sentencing Policies: One More Try for Federal*

Still, neither Congress nor the Commission took action to remedy these significant issues in crack cocaine sentencing.

In 2007, following the *Booker* "revolution," the Commission attempted to remedy crack cocaine sentencing by reducing the base offense level for crack offenses by two levels. *See* U.S.S.G. App. C., amend. 706; *see also Kimbrough*, 552 U.S. at 99-100. "This modest amendment yields sentences for crack offenses between two and five times longer than sentences for equal amounts of powder." *Kimbrough*, 552 U.S. at 100. The Commission described its "amendment as only . . . a partial remedy for the problems generated by the crack/powder disparity." *Id.* (quotation omitted). Consequently, the current crack guidelines, as amended in 2007, do not solve the problems identified in 2002, leaving federal courts to apply guidelines that overstate the harmfulness of crack cocaine, fail to provide adequate proportionality, and mostly impact minorities.

Given this history, it is little wonder that even after 2007, the crack cocaine guidelines recommend sentences that may not conform to § 3553(a) in the average case. *See Kimbrough*, 552 U.S. at 110. Accordingly, sentencing courts should carefully consider whether the crack guidelines recommend an appropriate sentence (in many cases they may not) and exercise caution in applying guidelines that too often yield unreasonable results. Here, treating the possession and delivery of 150

---

*Equal Protection*, 34 Am. Crim. L. Rev. 1211, 1212 (1997); *see also* Roberts at 1275 ("The War on Drugs is responsible for this level of black incarceration.").

These startling statistics should give pause to any court considering relying on the crack cocaine guidelines. Where the very creators of the guideline acknowledge the disproportionate impact on minorities, a request to vary from those guidelines merits careful consideration. Otherwise, federal courts run the risk of furthering the pernicious effects experienced by minorities as a result of guidelines that originated from political gamesmanship rather than a deliberate and thoughtful empirical approach.

grams of crack cocaine as equivalent to murder is simply unreasonable. But that is not the only problem with Brewer's sentence.

## B.    Unwarranted disparity

In *Kimbrough*, the Supreme Court determined that 18 U.S.C. § 3553(a)(6)[15] would work to prevent the sort of disparity observed in the Northern District of Iowa. In that case, the government argued that district courts should not be permitted to deviate from the guidelines based on disagreement with the crack/powder ratio. 552 U.S. at 107. The government argued that allowing sentencing courts such discretion could result in "defendants with identical real conduct" receiving "markedly different sentences, depending on nothing more than the particular judge drawn for sentencing." *Id.* (quotation omitted).

The Court rejected this argument, explaining that under 18 U.S.C. § 3553(a)(6), "district courts *must* take account of sentencing practices in other courts . . . . To reach an appropriate sentence, these disparities must be weighed against the other § 3553(a) factors and any unwarranted disparity created by the crack/powder ratio itself." *Id.* at 108 (emphasis added). The implication of *Kimbrough* is clear: district courts have a responsibility to consider the sentencing practices of other courts; otherwise differences in sentencing similar offenders could result from something as meaningless as which side of the interstate an offense is committed.

Brewer properly sought a variance based on the crack/powder disparity. He argued that a guideline sentence would create unwarranted disparity with other Northern District of Iowa crack cocaine sentences and cited *United States v. Gully*,

---

[15]That section provides that district courts shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

619 F. Supp.2d 633 (N.D. Iowa 2009). In *Gully*, Judge Bennett thoroughly examined the crack/powder disparity and concluded the appropriate ratio was 1:1. *Id.* at 644. But here Judge Reade never accounted for the sentencing practice of her colleague and Brewer's sentence may depend more on the judge he drew for sentencing than the factors in 18 U.S.C. § 3553(a).

The majority, by permitting district courts to say little or nothing in declining to vary from the crack cocaine guidelines, too easily sacrifices parity on the altar of discretion. To be sure, district courts are not required to vary from the crack guidelines on the basis of the crack/powder disparity. But in light of the history of the guidelines' promulgation, their impact on minorities, and the Supreme Court's remedy for disparity as discussed in *Kimbrough*, an exercise of discretion that concludes the crack/powder disparity does not warrant a variance requires more explanation than was done in this case.

Although § 3553(a) does not "insist[] upon a full opinion in every case[,]" the statute "does call for the judge to state . . . reasons." *Rita*, 551 U.S. at 356 (quotation omitted). Here, the lack of explanation for denying Brewer's request for a variance can only undermine the public trust. *See id.* ("Judicial decisions are reasoned decisions. Confidence in a judge's use of reason underlies the public's trust in the judicial institution."). The sentencing practices in the Northern District of Iowa may be those described in a recent report by the Justice Department: "More and more, we are receiving reports from our prosecutors that in many federal courts, a defendant's sentence will largely be determined by the judicial assignment of the case; i.e. which judge in the courthouse will conduct the sentencing. . . . This is extremely problematic. . . . [T]he existence of these dichotomous regimes will, over time, breed disrespect for the federal courts." U.S. Dept. of Justice, Criminal Division, Report to the United States Sentencing Commission at 2 (June 28, 2010).

I thus respectfully dissent. So long as differences in sentencing in the Northern District of Iowa are probably traceable to the location of a highway, the people of Iowa will question the propriety and fairness of sentencing. Even in this era of sentencing discretion, the judges in the Northern District of Iowa in particular, and across the country in general, have a responsibility to sentence drug offenders in a consistent and fair manner. I suggest that in remedying the crack cocaine sentencing disparity in the Northern District of Iowa, fairness favors Judge Bennett's 1:1 ratio over the ratios currently recommended by the guidelines. This court should vacate Brewer's sentence and remand for further consideration.

_____