Filed 8/13/14  P. v. Periman CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C071812 |
| Plaintiff and Respondent, | (Super. Ct. No. SF114626B) |
| v. | |
| ALLEN JOHN PERIMAN, JR., | |
| Defendant and Appellant. | |

Defendant Allen John Periman, Jr., contends his conviction of second degree murder should be reversed because the trial court allegedly allowed the jury to consider his possible punishment.  He claims the court did this by admitting into evidence defendant's incorrect statement in a police interview that he could be facing a penalty of 25 years to life in prison depending on what he said, and by not allowing a pinpoint instruction or closing argument to correct the misstatement.  We conclude the trial court did not err, and we affirm the judgment.

1

The victim, Jeffrey Wheatley, lived on Sussex Way in Stockton with roommates Drew Pyeatt and codefendant Valerie Nessler. Wheatley sold methamphetamine from the house. Nessler used methamphetamine and other drugs frequently. She was friends with codefendant Robert Turner. Turner and defendant were friends, and they visited the Sussex Way house together on three or four occasions to drink alcohol and use methamphetamine with Pyeatt. Pyeatt called defendant by his initials "AJ." He had defendant's cell phone number programmed in his cell phone and likely listed it as "AJ."

Turner lived with Amber Melendez. Turner's brother was murdered in the 1990's. It was a sore subject for Turner. According to Melendez, Nessler told Turner that Wheatley had admitted murdering Turner's brother. Melendez saw Turner and defendant hanging out together three to five times the month before Wheatley's murder. She knew defendant had a black car.

On April 6, 2010, Nessler called Pyeatt to ask him to pick her up and bring her home. In that call, Nessler warned Pyeatt not to be in the house because Turner was going to kill Wheatley that night. Pyeatt dropped his girlfriend off at her house, picked up Nessler, and drove her home. They arrived home around 3:00 p.m. Nessler began packing her clothing into trash bags. Wheatley was in his room.

Sometime during that afternoon, Pyeatt told Wheatley about Nessler's warning. Wheatley said he had convinced Turner not to do anything because he had not been involved in the murder of Turner's brother. Pyeatt did not call the police at that time because Turner had previously told him he would kill Pyeatt and his family if he said anything.

Pyeatt left to pick up his girlfriend and then returned to the Stockton house. When he arrived, Nessler placed her clothing in Pyeatt's truck. The three were about to leave when Nessler received a call on Pyeatt's cell phone. After the call, she decided to stay

and went back into the house, with Pyeatt's phone. Pyeatt and his girlfriend left and drove to Nessler's mother's home. They expected Nessler to join them there.

About 11:15 that night, a Lodi police officer saw a two-door, black Honda Accord making several turns on Cherokee Lane in Lodi. When the officer pulled behind the vehicle, it made an abrupt turn onto a residential street and stopped. The front passenger, a male, ran from the car. The officer contacted the driver, who was defendant. Nessler was sitting in the backseat. Defendant told the officer he was taking the male passenger to Lodi, but did not know his name. Nessler said the man's name was Albert Torres. The officer found a glass methamphetamine pipe in the car. The car had floorboard carpet.

Around midnight that night, Nessler called her friend Walter Montes and asked if she could come over to his apartment in Stockton. She arrived in a dark car that looked like a Honda with a man she identified as AJ, her "home boy." Nessler and AJ insisted they park the car inside of the apartment complex's gate. Inside the apartment, AJ said he had had a confrontation with another man. Montes and Nessler went into the bedroom. When Montes awoke in the morning, AJ was gone.

Meanwhile, at approximately 11:00 or 11:30 the night of April 6, Pyeatt and his girlfriend returned to his Sussex Way house, and found the left side of the front door on fire. Firefighters extinguished the blaze and discovered a body inside the house had been on fire. There was a strong odor of gasoline throughout the house. The body was subsequently identified as Wheatley. His severely burned body was lying on its back in the front entryway.

Wheatley died of shotgun wounds to his head, face, and trunk; blunt force trauma to his head, face, and trunk; at least 40 stab wounds to his head, face, neck, and trunk; and thermal burns to his head, face, trunk, and extremities. None of these injuries were instantaneously fatal. Wheatley was still alive when he was set on fire. A stab wound that entered his chest cavity was a fatal wound.

3

Given the nature of the injuries, the medical examiner believed Wheatley was shot first, then sustained the blunt force trauma and stab wounds, and then was set on fire. The blood trail indicated a significant incident occurred with Wheatley in the house's utility room; then he made his way through the kitchen to the entryway, grabbing an ottoman in the living room, and falling near the entryway. A different pattern of blood drops in the kitchen, the bathroom, a bedroom, the hall, and the living room suggested someone had cut their finger in the assault and walked down the hall swinging their hand.

Wheatley's DNA was identified in blood smears and splatters in the utility room and entryway, and in blood stains on shoes, gloves, and two knifes. Nessler's DNA was found on one glove. Turner's DNA was found on the handle of a knife and in blood drops in the kitchen, the bathroom, a bedroom, the hall, and a door to the garage. Defendant's DNA was not found at the scene.

Police arrested defendant on April 13, 2010. No blood was found in his car, but the floorboard carpet had been removed. Police interviewed defendant. We will say more about this interview below.

Phone records from Pyeatt's cell phone indicated Nessler and defendant called each other numerous times the night of the murder between 7:08 p.m. and 9:53 p.m. Also, draft text messages stored in the phone's draft box read, "Robert, he is in the --" and "Robert, I take it you are --." During his police interview, defendant denied calling Nessler on his cell phone that evening.

Robert Turner turned himself in on April 17, 2010. The tip of his middle finger of his right hand had been lacerated. The wound was healing and could have occurred on April 6, 2010. The laceration was consistent with Turner stabbing a hard surface with a knife, causing his hand to slide down the blade and cutting his finger.

Terry Edgar is a felon and heroin addict. He spoke with defendant in April 2010 when both of them were in jail. Defendant told Edgar he had been arrested for murder. Defendant said he and his friend received word a female friend of theirs was being

4

sexually assaulted. They went to protect her. Defendant said the attacker had also killed the friend's brother, and they wanted to retaliate for that. Defendant said he tried to talk the friend out of doing it.

Defendant drove them to the house and they went inside. He was there primarily to watch the door and ensure no one else entered. The friend took what defendant thought was a gun wrapped in a towel into the house. The friend went into another part of the house and shot the man in the face. In doing so, he also shot part of his own finger off. Defendant then heard noise and wrestling. The man who had been shot came toward the front door. Defendant tackled him and kicked him in the head multiple times.

Defendant told Edgar that Nessler was also in the house, and she stabbed the man in the back with a kitchen knife a number of times. Someone poured gas on the man and lit him on fire. Defendant and the others then left in his car and drove to Lodi. As defendant described this scene to Edgar, he made the sign of the "Hail Mary" and said, "Father, forgive me."

Defendant told Edgar he cleaned out his vehicle with bleach and pulled the carpet out because he wanted to get rid of the evidence. Defendant put the work clothes he had worn to the incident in his trunk, and he was worried about that. Defendant also told Edgar the shooter was going to take the rap, and he was going to claim he had loaned his car to someone.

Johnny Gallegos is a felon and drug addict who was in custody at the time of defendant's trial. He testified he and defendant saw each other daily for a month leading up to April 2010. However, he did not see defendant for a time between April 6 and April 13, 2010. When defendant finally came by, he looked nervous, kept repeating he was "going to go to hell," and asked Gallegos if he had seen the TV news. Gallegos asked him what was wrong, and defendant said he had killed someone. He said "they" beat the man up, put him in the car, blew his head off, put him back into the house, and set the house on fire. Defendant asked how he should clean his car. When Gallegos got

5

in the car, defendant asked him if it smelled like brain matter. Gallegos thought it smelled like cleaning supplies.

While this case was in trial, Gallegos was scheduled to appear at a hearing on his own criminal matter. Defendant and Gallegos rode the bus together to court. Defendant told Gallegos he was shocked Gallegos was going to testify in his trial, as he had these charges beat without Gallegos's testimony.

## DISCUSSION

Defendant contends the trial court improperly allowed the jury to consider possible punishment. It allegedly did so when it admitted into evidence as consciousness of guilt a statement defendant made in his police interview that if he had driven the codefendants to the crime scene without knowing their intent, he would do "life in prison" or "[t]wenty-five to life" in prison. Defendant also asserts the court erred when it denied his request for a pinpoint instruction that defendant's belief he faced a sentence of 25 years to life was not correct, and when it prohibited defense counsel from arguing to the jury that defendant was mistaken about the punishment he faced. We conclude the court did not err, and, even if it had erred, any error was not prejudicial under any standard.

A.    *Additional background information*

During their interview with defendant, detectives suggested he may have driven the codefendants to the Sussex Way house without knowing their true intent. Defendant said that would still be murder, he would be convicted, and he would go to prison. As the detectives encouraged him to consider the situation and speak the truth, defendant said he did not want to "end up saying the wrong thing and be put in a bad situation."

A few moments later, defendant stated this was a serious case, and he had to raise his son. As the officers encouraged him to tell the truth, the following dialogue occurred:

"[Defendant]: I gotta… I gotta… I gotta be careful what I say, right?

6

"Detective: Not if it's the truth. You gotta be careful what you say if it's a lie. [defendant], I… I can't… I can't explain it any easier than my partner did. We have plenty of times where there's somebody goes out to do a favor for somebody and it ends up blowing up and it's nothing what they thought was gonna happen.

"[Defendant]: Yeah, okay. And… And… And… And… Stupid me, get caught up in that position, then I still do life in prison.

"Detective: [Inaudible]

"[Defendant]: Twenty-five to life, wi--in prison.

"Detective: Mm-mm.

"[Defendant]: Twenty-five to life in prison, uh… For, for something…

"Detective: [Defendant], I'm not here to tell you what the punishment is. What's gonna happen here is I'm gonna walk out, my boss, and probably the District Attorney is gonna say what's going on, is he telling us the truth. . . ."

Defendant ultimately said Nessler and the "other guy" would try to pin everything on him.

The information charged defendant with first degree murder (Pen. Code, § 187, subd. (a)) and arson of an inhabited structure causing great bodily injury (Pen. Code, § 451, subd. (a)). It also alleged as enhancements a principal was armed with a shotgun (Pen. Code, former § 12022, subd. (a)(1)), defendant committed the murder while committing the arson (Pen. Code, § 190.2, subd. (a)(17)(H)), and the murder was intentional and involved torture (Pen. Code, § 190.2, subd. (a)(18)).

Prior to trial, the prosecutor moved in limine to admit defendant's statement to the detectives in its entirety up to the point he invoked his rights. Defense counsel objected to the entire statement being admitted, and specifically objected to defendant's reference to a sentence of 25 years to life. Counsel argued defendant was not admitting to murder and was speculating about the sentence for murder. He asserted punishment should not be considered. He also objected under Evidence Code section 352.

7

The prosecutor argued defendant's statement was a tacit admission of guilt; that he had to watch what he said because if he said what really happened, he would go to prison forever.

The trial court admitted the statement. The court stated: "Look, I'm going to admit it, balancing 352. It is probative, and it doesn't really traipse into the jury's decision about -- the jury is going to decide the facts, not punishment. It doesn't influence the jury or cause them to consider penalty or punishment. We've vetted that sufficiently with the questionnaire and that topic's come up more than one time in court. So it puts the statement in [context]. I think taking it out sanitizes the statement unfairly. So I think it's more probative and not really prejudicial in this situation, given the jury's knowledge that they are not here for that. That basically it is not an issue for them. And I can make a limiting instruction on that too. But I don't want to highlight it, make it sound more important than it is."

The prosecution also requested the court to preclude defense counsel from mentioning or referring to potential sentences to the jury. The court granted this in limine motion, stating it would not let either side argue penalty or punishment.

During trial, defense counsel requested CALCRIM No. 706, the instruction telling the jury not to consider punishment when deciding special circumstances, be augmented to inform the jury the potential punishment should defendant be found guilty on all counts was greater than 25 years to life. The court denied defendant's request. The court stated the standard instruction was sufficient as it instructed the jury not to consider punishment in any way. Counsel argued that defendant's assertion of what the punishment would be was incorrect, but the court stated defendant's statement was admitted to explain his state of mind at the time of his police interview. It was made in the context of defendant's concern over giving the police additional information.

Defense counsel then informed the court he intended to inform the jury in his argument that 25 years to life was not the punishment defendant faced if convicted.

Rather, it was life without the possibility of parole. The court stated it would not allow counsel to make that argument because that would be discussing penalty. Counsel's proposed argument was different than defendant's statement, because the latter concerned his mental state, that he knew the gravity of the conversation he was having with the police.

The jury convicted defendant of second degree murder, and it found the related gun enhancement true. It acquitted defendant of arson.

After trial, defense counsel filed a motion for a new trial, claiming the court committed prejudicial error in the above actions, abused its discretion by not excluding the defendant's statement under Evidence Code section 352, and violated his due process rights. The trial court denied the motion for the same reasons when the court ruled on the issue at trial.

The court sentenced defendant to a state prison term of 15 years to life, plus an additional consecutive one year for the gun enhancement.

B.      *Analysis*

Defendant contends the court abused its discretion when it admitted his incorrect statement about the possible punishment he was facing and later refused to instruct against it or allow counsel to address it. He asserts the statement was not relevant; rather, it invited the jury to consider a penalty when it deliberated, something a jury is not permitted to do. (*Shannon v. United States* (1994) 512 U.S. 573, 579 [129 L.Ed.2d 459, 466-467].)

We disagree with defendant's contention. The statement was relevant to show defendant's consciousness of guilt at the time of the police interview. Defendant was reluctant to provide additional information during the interview fearing what he said would lead to his incarceration. In other words, if he answered the detective's suggestion that he had driven the perpetrators to the crime scene, he would incriminate himself. That's why, in his words, he had to "be careful" with what he said. Evidence of

9

consciousness of guilt is relevant evidence. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1162.)

Defendant contends even if the statement was relevant, it was more prejudicial than probative and should have been excluded under Evidence Code section 352. He asserts the statement likely confused the jury into relying on its assertion of punishment of 25 years to life in prison, and it suggested to jurors defendant could be convicted of murder and face a life term even if he did not share the perpetrator's intent.

We disagree with this point as well. Evidence Code section 352 authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by the probability its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The record demonstrates the trial court weighed the evidence's probative value against its potential for prejudice, and found in favor of admitting it. The court reasoned the evidence was probative and would not influence the jury to decide defendant's fate based on the statement's incorrect assertion of his possible punishment. The court had also vetted that possibility in the jury questionnaire, and the jurors knew they were not there to decide punishment. In addition, the court gave a limiting instruction telling the jurors not to consider penalty or punishment. Under these circumstances, we cannot say the court abused its discretion in admitting the evidence under Evidence Code section 352.

Defendant argues instructing the jurors not to consider punishment did not cure the prejudice. He asserts that despite the instruction, the jurors believed they could consider the evidence about punishment for any purpose because the instructions did not tell the jurors the prohibition applied to any specific item of evidence. Hence, he sought a pinpoint instruction to that effect and the right to argue the point.

Defendant misreads the standard instruction. It informed the jurors that in their deliberations, they "may not consider or discuss penalty or punishment *in any way* when deciding whether a special circumstance, or any other charge, has been proved." (See

10

CALCRIM No. 706, italics added.)  The jurors did not need to be told the prohibition applied to any particular evidence, as they clearly understood it applied to everything they would consider in deliberations.

In addition, the jury was instructed with CALCRIM No. 3550, which again informed the jurors they "must reach [their] verdict without any consideration of punishment."  We presume the jury followed these instructions.  (See *People v. Ledesma* (2006) 39 Cal.4th 641, 684.)  To the extent there was any prejudice by admitting the evidence, the instructions cured any harm.

Even if the trial court erred in admitting the evidence and denying counsel's request for a pinpoint instruction and the right to address punishment in closing argument, the error would not be prejudicial under either the state standard of prejudice applicable to evidentiary errors (*People v. Watson* (1956) 46 Cal.2d 818, 836), or the federal standard that governs errors of due process (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]).  There is no reasonable possibility defendant would have obtained a more favorable outcome had the evidence not been admitted.

The evidence against defendant was overwhelming.  He confessed his involvement in the murder to his prison mate Edgar.  He admitted driving Turner to the residence, going inside with Turner, hearing Turner shoot the victim, tackling the victim as he ran towards the door, and kicking the victim multiple times in the head while he was on the ground.  He watched as the victim was stabbed and set afire, and then he drove Turner and Nessler to Lodi.

At 11:15 that night, police stopped defendant's car in Lodi.  The male passenger fled, but defendant was in the driver's seat and Nessler was seated in the back.  After the stop, defendant and Nessler drove back to Stockton, where they anxiously asked Nessler's friend to let them park defendant's car behind the complex's gate.

11

Before his arrest, he told his friend Gallegos he was going to hell because he had killed someone. He also told Gallegos he had cleaned the inside of his car because of the killing. Gallegos said the car smelled of cleaning supplies.

Phone records also indicated he and Nessler were in contact many times the evening of the murder, contrary to what defendant told police.

Moreover, defendant's sentencing comment did not prejudice him because even with its admission, the jury convicted him of second degree murder, a lesser included offense with a shorter sentence than the 25-year-to-life sentence a first degree murder conviction threatened.

Considering this evidence, we have no doubt defendant would still have been convicted of murder had his statement to police about possible punishment not been admitted into evidence. As a result, we conclude the trial court did not abuse its discretion by admitting the statement and denying counsel's request to address the statement in a pinpoint instruction and at argument.

### DISPOSITION

The judgment is affirmed.


_____NICHOLSON_____, J.


We concur:


_____BLEASE_____, Acting P. J.


_____HULL_____, J.


12